Lillian MCNALLY, Agnes A. Nelson, and Martha Johnson on behalf of themselves and all others similarly situated, Respondents,

v.

Charles TOLLANDER and Burnett County, Appellants.†

Court of Appeals

*No. 78–783. Argued August 14, 1979.—*
*Decided May 13, 1980.*
(Also reported in 294 N.W.2d 660.)

† Petition for review granted. ABRAHAMSON, J., took no part.

For the appellants there were briefs by *Earl Munson, Jr.,* and *La Follette, Sinykin, Anderson & Munson,* attorneys, and *David E. McFarlane,* of counsel, all of Madison, and oral argument by *Earl Munson, Jr.*

For the respondents there was a brief by *Thomas D. Bell* and *Doar, Drill, Norman, Bakke, Bell & Skow,* of New Richmond, and oral argument by *Thomas D. Bell.*

Before Dean, P.J., Donlin, J. and Dykman, J.

DYKMAN, J.   This case is an appeal from a final judgment entered by the circuit court on October 18, 1978, and amended on November 8, 1978, which declared void a county seat removal referendum election held on November 2, 1976.   In that election the majority of voters in 16 of Burnett County's 24 municipalities voted to remove the county seat from the Vil-

lage of Grantsburg in the far western part of the county to the Township of Siren, which is centrally located. Citizens of the remaining eight municipalities did not vote on the question because the referendum ballots were withheld by the local election clerks at the direction of the county clerk.

The plaintiffs,[1] citizens who did not receive the county seat removal referendum ballots, commenced this action on December 9, 1977, seeking to declare the county seat removal election invalid and to enjoin any action that would change the county seat from Grantsburg. After a 3-day trial on April 24–26, 1978, the trial court awarded such relief, declaring the election invalid, in essence, because the many procedural irregularities caused "reasonable doubt overall that the election fairly represented the will of the voters of Burnett County."

Before this court can review the correctness of the trial court's conclusion, the complicated fact situation behind this election must be set forth. The facts are essentially undisputed. The procedural irregularities in this case stem from the unique nature of a county seat

---

[1] The plaintiffs are the wives of three Burnett County supervisors actively opposed to the county seat removal. These supervisors headed the Concerned Taxpayers of Burnett County—a citizen's group opposed to the removal.

On August 9, 1977, James McNally, Lowell Nelson and Raymond Johnson filed a summons and complaint presenting allegations nearly identical to those set forth in the summons and complaint filed by their wives on December 9, 1977. The first complaint demanded a judgment enjoining Charles Tollander and County Clerk Iverson from certifying or attesting to the results of the election to the Acting Governor of Wisconsin. The first summons and complaint were never served upon the defendants, so that action was never properly commended. Sec. 801.02(1), Stats. It can hardly be said that the present plaintiffs were unaware of this first action. While we need not decide whether these plaintiffs and others who sought to prevent the county seat removal are guilty of inequitable conduct, the commencement of the present action raises that inference.

removal election which can only be conducted pursuant to sec. 59.11, Stats.[2] Section 59.11 (4) provides in relevant part that no such election can be held:

[2] Section 59.11, Stats., provides:

(1) The county seat shall be fixed and designated by the county board at the first regular meeting after the organization of any county; and no county seat shall be changed except as provided in this section.

(2) If two-fifths of the legal voters of any county, to be determined by the registration or poll lists of the last previous general election held therein, the names of which voters shall appear on some one of the registration or poll lists of such election, present to the county board a petition signed by them asking a change of the county seat to some other place designated in such petition, such board shall submit the question of removal of the county seat to a vote of the qualified voters of the county. Such election shall be held only on the day of the general election, notice thereof shall be given and the same shall be conducted as in the case of the election of officers on that day, and the votes shall be canvassed, certified and returned in the same manner as other votes as such election. The question to be submitted shall be "Shall the county seat of . . . county be removed to . . . ," and the question shall appear on a separate ballot.

(3) If a majority of all the votes cast at such election on that subject are in favor of the proposed change, the chairman of the county board shall certify the same, with the attestation of the county clerk, to the governor, who thereupon shall issue his proclamation to that effect and cause the same to be published in the official state paper, and from the date of such publication the place so designated shall be the county seat of such county, and the county board shall not again submit the question of removal within five years.

(4) However, when a county seat has been established in one place for a period of fifteen years or more, and the county has there erected permanent buildings of the value of not less than ten thousand dollars, the county seat shall not be removed, nor shall any application for its removal be submitted to a vote of the electors of the county unless a petition signed by at least one-half of the resident freeholders of the county as evidenced by the recorded deeds in the office of the register of deeds of the county, in favor of such removal, shall first be presented to the county board and filed in the office of the county clerk; and no such election

unless a petition signed by at least one-half of the resident freeholders of the county as evidenced by the recorded deeds in the office of the register of deeds of the county, in favor of such removal, shall first be presented to the county board and filed in the office of the county clerk . . . .

On November 20, 1975, George Benson, a Siren attorney and head of a citizen's group urging the county seat removal, presented a petition with approximately 2,900 signatures in favor of moving the county seat to Siren to the Burnett County Board and filed it with the county clerk.

The impetus for urging the county seat removal was the need for a new county jail. The Wisconsin Department of Corrections had informed the county that it would close and condemn the present Burnett County jail, built in 1888, by August 2, 1976. This need, and the desire to consolidate all county offices in one complex at a more centralized location, prompted citizen action to urge removal of the county seat to Siren. Several county offices were already located at Siren and nearby Webster. The present courthouse, about 75 years old, was deemed inadequate.

The county seat removal question sparked much controversy, generated much publicity in the local newspapers and caused the formation of two opposing groups. The first, the Burnett County Jail and Courthouse Relocation Committee, circulated the petitions necessary to bring the question to a vote while the second, the Concerned Taxpayers of Burnett County, opposed the petitions and subsequent action taken to bring the question to a vote. The county board was divided on the

---

to change any county seat shall be held for a period of five years after the year in which a courthouse or other county building costing three thousand dollars or more was built at the county seat and occupied for county purposes.

issue, with a slim majority of supervisors in favor of the removal.

On December 16, 1975, after the first petition was presented, the county board established a committee to determine the number of resident freeholders in Burnett County and to determine the validity of the signatures on such petitions.

The committee first prepared a resident freeholder list with information provided by the county's municipal boards. In March, 1976, they submitted a copy of their real estate tax rolls which had residency status noted. The committee confirmed the "freeholder" status of names on the freeholder list by checking the tract index and the recorded conveyances. The committee then compared its final freeholder list, which had all questionable names resolved after checking again with each municipality's clerk, against the first petition.

The committee demanded the first petition, which had been filed with the county clerk, to determine the eligible signatures on the basis of the resident freeholder list. On July 12, 1976, the county clerk, Francis Nero, refused to turn over the petition unless committee members first signed a release form. The committee members did eventually sign a release and received the first petition on July 23, 1976. The number of qualified signatures on the first petition was 2,486 out of 5,727 resident freeholders, as had been determined by the committee.

By this time a second group of petitions was presented to the county board and filed with the county clerk on July 15, 1976. A third group of petitions was presented on August 19, 1976, and a fourth on August 27, 1976.

These petitions were turned over to the committee by direction of the county board on August 19, 1976. The county clerk had again refused to relinquish them to the committee.

The county board had initially agreed to a cut-off date of November 20, 1975, the date the first petition was presented, for adding or subtracting names from petitions and for determining the number of resident freeholders. Upon the advice of the Burnett County District Attorney the additional petitions were joined with the first petitions and treated as one petition.

On September 17, 1976, the district attorney reported to the county board that the four groups of petitions contained a total of 3,092 qualified signatures out of a total of 5,727 resident freeholders. The county board petition verification committee did not officially certify these figures as its final calculation, however.

Because the committee treated the last three groups of petitions as part of the first it updated the resident freeholder list by crossing off or adding names of persons who bought or sold property or who died since the original cut-off date of November 20, 1975. Committee members did testify that their list of resident freeholders was the best they could compile to determine such status with accuracy, save to speak to each person listed on the petition.

At the September 17, 1976 board meeting an attorney for the concerned taxpayers group requested a hearing to examine and possibly challenge the petitions and freeholder list. The request was denied. No specific challenges to any name on either the freeholder list or on a petition was ever made.

At the September 17 meeting the county board found the number of signatures from the consolidated petitions to be sufficient under sec. 59.11(4), Stats., and it voted to submit the county seat removal question in the November, 1976 general election.

On September 29, 1976, the county board directed County Clerk Nero to prepare and distribute the county seat removal ballots. The county clerk refused based

on an August 18, 1976 letter from the State Elections Board which stated that it was too late to give proper notice for an election on the county seat removal referendum to be held in November, 1976. Pursuant to sec. 10.06(2)(h) and (m), Stats., proper notice would have been given only if the county clerk had published the proper notice on Tuesday, May 25, Tuesday, June 1, Monday, October 25 and Monday, November 1. The clerk did not earlier reveal this letter to the county board.

A county board member contacted the State Elections Board about the election notice problem and learned by letter of October 13, 1976, that it could be cured "if the total vote on the county seat question were a significant percentage of the total votes on other offices." The county board again directed the county clerk on October 21, 1976, to prepare and distribute ballots on the county seat removal to all precinct clerks. The clerk refused and the county board chairman (defendant Tollander) appointed a committee to print and distribute ballots to all precinct clerks in his stead.

The ballots were delivered to all precinct clerks between October 23 and 25, 1976.

On October 26, Clerk Nero sent a letter drafted by the attorney for concerned taxpayers to all election clerks in the county directing them to not distribute the referendum ballots or risk incurring criminal liability.

On October 28, the district attorney sent all election clerks letters informing them that it would not be illegal to distribute the ballots, and urging them to do so.

On October 30, many of Burnett County's municipal election clerks attended a UW–Extension telelecture seminar conducted for county election officials. The clerk for the Town of Daniels asked the legal counsel for the State Elections Board whether ballots printed and de-

livered only nine days prior to the election by someone other than the county clerk would be legal. The legal counsel responded that a clerk who distributes such a ballot could face criminal penalties and should avoid distributing ballots which do not comply with election procedures.

Formal notice of the referendum election was published in the official county newspaper, the *Burnett County Sentinel*, and in the *Inter-County Leader* on Wednesday, October 27, and in the *Spooner Advocate* and *Washburn County Register* on Thursday, October 28. Testimony at trial established that the county seat removal question was widely discussed but that confusion existed in some minds as to whether the question would be on the November ballot.

On November 2, 1976, 6,558[3] persons out of a potential voting age population of 7,981 voted.[4] This constituted an approximate 80 percent rate for the election where voters chose presidential, congressional, state and local officers.

In the 16 eastern townships of Burnett County, voters received the county seat removal referendum ballots. The referendum passed by a vote of 3,257 to 588 with 86 persons not exercising their opportunity to vote on this question. In the eight western townships a total of 2,578 persons who voted in the election were denied the referendum ballots by local election clerks. Forty-nine

[3] This figure was compiled from tally sheets for the November, 1976 election and was admitted at trial as exhibit 178.

[4] This figure was arrived at by subtracting the number of students aged 0–17 in Burnett County according to the State Department of Administration's 1976 school census from the estimated total population from estimated figures provided by the Wisconsin Department of Administration Demographic Services Center.

absentee[5] voters in the 16 eastern townships did not receive the county seat removal referendum ballot.

The referendum ballots were sealed in ballot bags and delivered to Clerk Nero with completed tally sheets. He placed them in his vault with all the ballots for the November, 1976 election. He refused to canvass the election results on the county seat removal referendum, again pursuant to advice received from legal counsel for the State Elections Board by phone conversation and a letter of November 10, 1976.

In January of 1977, the Burnett County District Attorney requested an opinion as to the legality of the referendum election from the Wisconsin Attorney General who determined that the election was valid despite the various procedural irregularities. 66 Op. Att'y Gen. 219 (1977).

A canvass was eventually conducted by the Burnett County Board Election Committee on August 10, 1977. On August 17, 1977, Burnett County Board Chairman Tollander certified the results of the county seat removal election to Acting Governor Martin Schreiber. This was not attested to by the new Burnett County Clerk, Donald Iverson, as required by sec. 59.11(3), Stats. Iverson refused to do so because he was not county clerk at the time of the November, 1976 election. On September 9, 1977, the results were recertified and Iverson did attest to Tollander's signature.

On September 27, 1977, Schreiber sought further clarification as to the validity of the election from the Wisconsin Attorney General. The attorney general responded on November 3, 1977, that he would be "unable to say with the same assurance as before that the election would be held valid if a court test were brought,"

---

[5] The clerks from the 16 eastern districts testified to the number of absentee ballots sent out without a county seat removal referendum ballot. The number, represented as exhibit 181 at trial, totalled 49.

given notice of further procedural irregularities in the election. Nonetheless, Schreiber issued a proclamation on November 25, 1977, designating and establishing the Town of Siren as the Burnett County seat and this proclamation was published in the official state newspaper.

On December 9, 1977, the plaintiffs then commenced this suit challenging the election.

On appeal from the trial court's decision invalidating the election, each party raises several distinct issues. The appellant contends that:

(1) Section 59.11(4), Stats., violates the United States and Wisconsin Constitutions by allowing only property owners to petition for a county seat removal election;

(2) The trial court erred in invalidating the election because there was no "clear certification" of the numbers of petitioners or resident freeholders in the county and because no public hearing was held by the county board on the petitions;

(3) The trial court could not void the election unless it first found (a) noncompliance with a mandatory election law, and (b) an affected vote result from election law violations in the absence of fraud or misconduct in the election procedure;

(4) The court could not void the election because it doubted that the vote represented "the will of the people" due to preelection confusion when 80 percent of eligible county voters went to the polls in the November, 1976 election;

(5) The trial court should not have considered the potential vote of nonvoters in reviewing the number of defects in this election;

(6) The trial court erred in voiding the election because the refusal to deliver ballots to some voters did not affect the outcome of the election;

(7) The plaintiffs should be denied relief on equitable principles because of their own conduct.

The respondents argue that this case presents five issues distinct from those raised by the appellants. They contend that:

(1) The trial court's findings that (a) confusion existed in the minds of the voters on election day as to whether a referendum ballot would be submitted, and (b) there was reasonable doubt that the election fairly represented the will of the voters of Burnett County, are supported by the great weight and clear preponderance of the evidence;

(2) The results of an election wherein more than 50 percent of the voters appearing at the polls are deprived of the opportunity to vote should not be upheld;

(3) The proponent of the election bears the burden of proof in an election challenge once the challenger has established that qualified voters were deprived of their constitutional right to vote;

(4) The appellants lack standing to challenge the constitutionality of sec. 59.11(4), Stats.;

(5) The results of an election in which the ballots were prepared and authorized contrary to sec. 7.50(1) (a), Stats., should not be upheld.

We deem the determinative issues to be whether the trial court applied the proper test in assessing the validity of this election and whether the election challengers met their appropriate burden of proof.

### Nature of the Challenge

The parties differ in their characterization of this election challenge. The appellants claim that the respondents have brought an election irregularities challenge. The respondents argue that this is a disenfranchisement challenge, distinct from a normal irregularities challenge

because over 50 percent of the voters in this election were denied the opportunity to vote. Because of the fundamental nature of the constitutional right to vote,[6] they claim that they need only prove that qualified voters were denied the right to vote in order to shift to the appellants the burden of proving the legality of the election.

We do not accept the respondents' contention that this suit pertains only to voter disenfranchisement. First, contrary to the respondents' assertions, more than 50 percent of the voters in the election *did* vote on the referendum issue. A total of 3,845 voters cast ballots on the county seat removal question. This is more than half of the 6,558 electors that did vote in the November, 1976 election.[7] Consequently were this court to set aside the election on the basis of ballot deprivation to *some* voters, we would disenfranchise the majority of voters who did express their preference at the polls. As long

[6] The Wisconsin Constitution, as amended, provides that every person 18 or older residing in the state for 6 months preceding any election who resides in an election district shall be deemed a qualified elector.

Article III, sec. 1, Wisconsin Constitution provides in part:

Every person, of the age of twenty-one years [the age requirement is now 18 years pursuant to the 26th Amendment to the United States Constitution and sec. 6.02 and sec. 6.05, Stats.] or upwards, belonging to either of the following classes, who shall have resided in the state for one year [the residence requirement has been changed to ten days pursuant to sec. 6.02, Stats.] next preceding any election, and in the election district where he offers to vote such time as may be prescribed by the legislature, not exceeding thirty days, shall be deemed a qualified elector at such election.

The right to vote and to have that vote count is a fundamental, constitutionally-protected right. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *State ex rel. Crain v. Acker*, 142 Wis. 394, 395, 125 N.W. 952 (1910).

[7] *See* n. 3.

as ballots "express intelligibly the choice of the voter upon the matter to be voted on" they should not be voided. *State ex rel. Holden v. Tierney,* 23 Wis. 430, 434 (1868). *See Petition of Leuch,* 244 Wis. 305, 317, 12 N.W.2d 61 (1943). The Wisconsin Supreme Court has long sought to preserve the validity of cast ballots which did not comply with election statutes when (a) the invalidity of the ballot was not the fault of the voter—but of election officials; and (b) the will of the voters could be ascertained from the ballots. *State ex rel. Wood v. Baker,* 38 Wis. 71, 87 (1875) ; *Ollmann v. Kowalewski,* 238 Wis. 574, 300 N.W. 183 (1941) ; *State ex rel. Symmonds v. Barnett,* 182 Wis. 114, 195 N.W. 707 (1923) ; *State ex rel. Graves v. Wiegand,* 212 Wis. 286, 249 N.W. 537 (1933). We find both those conditions met here and, without yet considering the effect of all the procedural defects in this case, favor the preservation of ballots cast to those not cast. We will not disenfranchise those voters even though a large number of voters are denied the right to express their view. The Wisconsin Supreme Court confronted the effect of excluding qualified voters in the early case of *State ex rel. Wold v. Hanson,* 87 Wis. 177, 58 N.W. 237 (1894). In *Hanson,* 18 voters were erroneously excluded from voting for Wold by election inspectors who said they were not qualified. Wold had lost the election for clerk of circuit court to Hanson by a vote of 382 to 395. Had the 18 voters been allowed to vote for him, Wold would have won. On appeal the supreme court said the election should not be voided *despite the arguable change in result:*

"The exclusion of legal votes—not fraudulently, but through error in judgment—will not defeat an election. It is an error which there is no mode of correcting, even by the aid of the courts, since it cannot be known with certainty afterwards how the excluded electors would have voted; and it is obvious that it would be dangerous to receive and rely upon their subsequent

statements as to their intentions, after it is ascertained precisely what effect their votes would have had upon the result. . . . *An election honestly conducted under the forms of law ought generally to stand, notwithstanding individual electors may have been deprived of their votes, or unqualified voters have been allowed to participate.* Individuals may suffer wrong in such cases, and a candidate who was the real choice of the people may sometimes be deprived of his election; but, as it is generally impossible to arrive at any greater certainty of result by resort to oral evidence, public policy is best subserved by allowing the election to stand, and trusting to a strict enforcement of the criminal laws for greater security against the like irregularities and wrongs in the future." *Hanson,* 87 Wis. at 179, 58 N.W. at 237–38. (Quoting Cooley, *Const. Lim.* 781 (6th ed.). Emphasis added.)

*Hanson* demonstrates a strong judicial preference for sustaining election results. Its policy reasoning applies to the instant election where a similar defect—exclusion of legal votes through an error in judgment—occurred. We cannot void this election for the *sole* reason of exclusion of voters. The Wisconsin Supreme Court in *Clapp v. Joint School Dist.,* 21 Wis.2d 473, 481, 124 N.W.2d 678, 683 (1963), could not have implied such a consequence, which respondents urge, when it said:

We do not have a case of a resident demanding an absentee ballot for himself and being refused by the school-district clerk and without such an affirmative proof, the election ought to not be held void if it is considered the furnishing of absentee ballots is mandatory.

In *Clapp,* the court affirmed the trial court in upholding a referendum election challenged for procedural irregularities because they had no "effect upon the final result of the referendum." 21 Wis.2d at 480, 124 N.W.2d at 682.

We find as did the trial court that the failure to distribute ballots is but one of the many procedural irregularities which marred this election. It should not

be treated as a separate ground for alleviating the burden of proof upon the plaintiffs in the trial court. The burden lies upon the challenger in an election contest to establish sufficient grounds for rejecting "ballots cast at an election good on their face." *Ollmann*, 238 Wis. at 581, 300 N.W. at 186; 26 Am. Jur. 2d *Elections* sec. 342 at 161 (1966).

## The "Test" of Legality

A party seeking to set aside cast ballots must first establish their noncompliance with mandatory election laws and further prove that these procedural irregularities affected the ultimate outcome of the election to the point where the challenger would have prevailed in their absence. While the Wisconsin Supreme Court has never explicitly laid down this test, it has adopted this approach in election challenges, when applying sec. 5.01(1), Stats., which provides:

Title II [the election laws embodied in chs. 5–12, Stats.] shall give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of its provisions.

The court has applied this section in several cases to allow the election result to stand despite noncompliance with election statutes, some of which were mandatory in nature. In *Lanser v. Koconis*, 62 Wis.2d 86, 214 N.W.2d 425 (1974), the court allowed 33 absentee ballots which had not been delivered pursuant to statute to be counted despite the seemingly mandatory provisions of sec. 6.87(6), Stats., which provide:

(6) The ballot shall be returned so it is received by the municipal clerk in time for delivery to the polls before the closing hour. *Any ballot not mailed or de-*

*livered as provided in this section shall not be counted.*
(Emphasis supplied.)

The court in *Lanser,* 62 Wis.2d at 91, 214 N.W.2d at
427, said:

"The rule for the construction of election statutes
as to whether mandatory or directory, adopted by this
court in *Sommerfeld v. Board of Canvassers* (1955),
269 Wis. 299, 69 N.W.(2d) 235, and *Olson v. Lindberg*
(1957), 2 Wis.(2d) 229, 235, 85 N.W.(2d) 775, is as
follows:
" ' "The difference between mandatory and directory
provisions of election statutes lies in the consequence
of nonobservance: An act done in violation of a manda-
tory provision is void, whereas an act done in violation of
a directory provision, while improper, may nevertheless
be valid. Deviations from directory provisions of election
statutes are usually termed 'irregularities,' and, as has
been shown in the preceding subdivision, such irregu-
larities do not vitiate an election. Statutes giving direc-
tions as to the mode and manner of conducting elections
will be construed by the courts as directory, unless a
noncompliance with their terms is expressly declared to
be fatal, or will change or render doubtful the result,
as where the statute merely provides that certain things
shall be done in a given manner and time without de-
claring that conformity to such provisions is essential
to the validity of the election." ' " (Quoting *Gradinjan
v. Boho,* 29 Wis.2d 674, 681, 139 N.W.2d 557, 561
(1966).)

The court in *Lanser* construed the delivery provisions
in absentee ballot statutes to be directory, relying on
sec. 5.01, Stats., to preserve the will of the elector. It
indicated that it would have invalidated such ballots upon
"the slightest evidence of any fraud, connivance or at-
tempted undue influence." *Lanser,* 62 Wis.2d at 93, 214
N.W.2d at 428. In the absence of such evidence the court
decided against disenfranchising the absentee voters
thereby allowing Koconis to win a Milwaukee county

supervisor position over Lanser by three votes. The court concluded:

". . . We have held the word 'shall' can be construed to mean 'may.' *George Williams College v. Williams Bay*, 242 Wis. 311, 7 N.W.(2d) 891. In passing upon statutes regulating absentee voting, the court should look to the whole and every part of the election laws, the intent of the entire plan, the reasons and spirit for their adoption, and try to give effect to every portion thereof."

Considering all the facts in this case, we are of the opinion that the mandate of sec. 5.01, Stats., requires the conclusion that these absentee voters' ballots be counted. (Quoting *Sommerfeld*, 269 Wis. at 303–04, 69 N.W.2d at 238.) *Lanser*, 62 Wis.2d at 93–94, 214 N.W.2d at 428–29.

Cf. *Olson v. Lindberg*, 2 Wis.2d 229, 85 N.W.2d 775 (1957).

The Wisconsin Supreme Court has repeatedly construed election statutes to be directory to uphold election results in the following cases: *State ex rel. Tank v. Anderson*, 191 Wis. 538, 211 N.W. 938 (1927); *State ex rel. Bancroft v. Stumpf*, 21 Wis. 579 (1867); *Ollmann*, 238 Wis. 574; *Graves*, 212 Wis. 286; *State ex rel. Oaks v. Brown*, 211 Wis. 571, 249 N.W. 50 (1933); *Petition of Anderson*, 12 Wis.2d 530, 107 N.W.2d 496 (1961); *Sommerfeld*, 269 Wis. 299; and, *Schmidt v. West Bend Board of Canvassers*, 18 Wis.2d 316, 118 N.W.2d 154 (1962).

In *Clapp*, 21 Wis.2d 473, the court upheld a school bond referendum election which approved a school bond issue by a margin of only four votes. It affirmed the judgment dismissing the complaint which had alleged that the election was void because of improper election procedure and the disenfranchisement of absentee eligible voters. The court ruled that statutory procedures[8] for

---

[8] In many jurisdictions post-election relief depends on the existence of a specific statute. *See, e.g., Moffat*, 361 A.2d 74 (construing N.J. Stats. Ann. 19:29–1, which allows New Jersey voters

challenging election results on the basis of qualifying
or disqualifying voters are not exclusive for challenges
to the validity of the entire election on the basis of
other defects, irregularities, mistakes or fraud. The
court affirmed the trial court's conclusion that the defects
and irregularities were not of such a nature as to re-
quire the election to be declared void. It found the
statutory provisions violated to be merely directory in
nature. Irregularities had occurred in the qualifying
of the election officials, endorsement of the ballots, the
absence of padlocks on the sealed ballot boxes, the time
of opening the polls at one precinct, the failure to pro-
vide absentee ballots, and the place of counting the
ballots at this precinct.

The supreme court in *Clapp*, 21 Wis.2d 473, noted
that trial courts must apply sec. 5.01, Stats., (then sec.
5.011, Stats. 1963) when reviewing election irregulari-
ties. A close reading of *Clapp*, 21 Wis.2d at 481, 124
N.W.2d at 683, indicates that "the will of the electors"
is upheld in normal cases where election statutes are
not complied with when the result of the election re-
mains unchanged despite the challenge. *See Ollmann*,
238 Wis. at 581. Only in cases where the result would
be altered or where the irregularities "permeate the elec-
tion process" would the election not be "an expression
of the will of the voters." The court explained that the
latter "defects, mistakes, irregularities, or illegality in
the election procedure must be of such a nature as to
cast serious doubt upon the legality of the entire election
as an orderly and proper means of ascertaining the

to contest the election of any person to any public office upon one
or more of the enumerated grounds); *Developments in the Law—
Elections*, 88 Harv. L. Rev. at 1306–1311.

The only allowable statutory post-election actions in Wisconsin
are set forth in secs. 9.01 and 9.10, Stats., allowing for an elec-
tion recount or recall of an elected official under certain circum-
stances.

will of the people entitled to vote." *Clapp,* 21 Wis.2d at 481–82, 124 N.W.2d at 683.

In the instant case six instances of noncompliance with election statutes occurred: (1) Notice was defective contrary to secs. 10.06(2)(h), 10.01(2)(a), (b) and (c), and 10.06(2)(m), Stats.; (2) Printing of the referendum ballots was arranged by a county board committee and not the county clerk contrary to secs. 7.10(2) and 7.50 (1)(a), Stats.; (3) Ballots were distributed by a county board committee, not the county clerk contrary to sec. 7.10(3), Stats.; (4) Ballots were not distributed to voters in eight districts contrary to sec. 7.15(1)(c), Stats.; (5) Ballots were canvassed by a county board committee, not the county clerk contrary to sec. 7.60, Stats.; (6) The ballots provided by the county board committee were cast and counted in the election contrary to sec. 7.50(1), Stats.

Of the above statutes violated only sec. 7.50(1), Stats., appears mandatory and provides by its terms that "only ballots provided by the person authorized to have them printed shall be cast and counted in any election." Even this statute may be read as directory if "the will of the electors" can be determined. *Lanser,* 62 Wis.2d at 91, 214 N.W.2d at 427.

The trial court found the "will of the voters" could not be determined, because newspaper publicity caused confusion over whether the election would be held. This irregularity is a notice problem, however, and not even a violation of a mandatory election statute.

We must reverse the trial court's determination of the effect of the procedural irregularities in this election.

■ Because this case involves drawing legal conclusions from primarily undisputed facts this court is not bound by the trial court's ruling. As the Wisconsin Supreme Court noted in *National Amusement Co. v. Dept. of*

*Revenue,* 41 Wis.2d 261, 266, 163 N.W.2d 625, 627--28 (1969) :

"Here we have the trial court applying the law to the facts or the facts to the law, as it sees it. In such cases this court is not bound by the findings of the trial court, and the rule that the findings must be sustained unless against the great weight and clear preponderance of the evidence is not applicable." (Quoting *Dairy Queen of Wisconsin, Inc. v. McDowell,* 260 Wis. 471, 474, 51 N.W. 2d 34, 36 (1952), *reh. den.* 52 N.W.2d 791 (1952)).

The trial court's decision was based primarily upon two findings: (1) confusion existed in the minds of the voters as to whether the election would be held; and (2) the results of the election did not represent the will of the voters of Burnett County. The first finding, while pertinent to the question of the adequacy of the notice of the election, is irrelevant to whether the notice defects due to violations of secs. 10.06(2)(h), 10.01 (2)(a), (b) and (c), and 10.06(2)(m), Stats., required that the election be set aside.

The trial court relied upon *Janesville Water Co. v. Janesville,* 156 Wis. 655, 146 N.W. 784 (1914), to find that the reasons for the statutory notice requirements had not been met because newspaper publicity and testimony at trial showed that confusion existed over whether the election would be held. In *Janesville Water Co.,* the supreme court invalidated an election upon the question of the acquisition of a public utility by the City of Janesville. The city charter and existing statutes required that ten days' notice be given and the first publication occurred only nine days before the election. The court read the notice statutes as mandatory in nature. It noted that where special questions are submitted to voters at a general election no presumption that the voters would be aware of the nature of the election can exist, as would be the case in general elec-

tions. *Janesville Water Co.*, 156 Wis. at 658. It found that the voters did not have adequate time to investigate, consider and discuss the subject voted on, stating that voters might "come to a different conclusion had two days more been given the electors in which to consider and discuss the matter." *Janesville Water Co.*, 156 Wis. at 660, 146 N.W. at 786.

The approach taken in *Janesville Water Co.* of evaluating whether the statutory purpose of notice had been met was modified by the supreme court in *Oaks*, 211 Wis. 571; and *Commonwealth Tel. Co. v. Public Service Comm.*, 219 Wis. 607, 263 N.W. 665 (1933). In its stead the supreme court said that the trial courts are to evaluate elections with notice defects pursuant to sec. 5.01, Stats., so "that a court shall not set aside the ascertained result of political procedure if in fact the *will of the electors can be ascertained.*" (Emphasis supplied.) *Oaks*, 211 Wis. at 580, 249 N.W. at 53. The will of the electors is expressed by the ballots actually cast. *Graves*, 212 Wis. at 293. Thus the trial court was limited in the *instant action* to determining whether the lack of proper statutory notice significantly diminished the number of ballots cast.

In this case it is difficult to imagine how the notice defect could have affected the actual result of the election. While the newspaper articles in the record paint a picture of uncertainty over whether the election would be held,[9] official notice was given by publication of the

---

[9] The newspaper publicity in the months preceding the election does manifest confusion as to whether the county seat question would be put on the November, 1976 ballot. *See e.g. Inter-County Leader*, September 22, 1976, ("Change of County Seat Petitions Judged Sufficient; Too Late for November Vote") ; *Burnett County Sentinel*, October 6, 1976, ("County Seat issue not on November ballot according to County Clerk"); *Inter-County Leader*, October 6, 1976, ("Burnett Board Approves Valuation, Fails in Effort for

facsimile ballot on October 27, 1976, in the *Inter-County Leader* and *Burnett County Sentinel,* and on October 28, 1976, in the *Spooner Advocate* and *Washburn County Register.* Thus the question of substantial compliance with the notice statutes can only be gauged by the voter turnout.

The election figures reveal that 6,558 persons in Burnett County voted in the November, 1976 election. While no completely accurate figure of the voting age population exists, 7,981 persons appeared eligible to vote.[10] The percentage of eligible persons voting would be approximately 82 percent given these figures.

The appellants introduced testimony from Professor

Referendum"); *Burnett County Sentinel,* October 27, 1976, ("The Sentinel was unable to learn if the issue would go to the voters or if court action would be expected to stop the ballots from being distributed").

However, sufficient publicity appeared in the local newspapers to offset this confusion and inform the public of the upcoming election and the issues involved. *See e.g. Burnett County Sentinel,* September 22, 1976, ("County Board passes resolution to place county seat issue on ballot"); *Inter-County Leader* and *Burnett County Sentinel,* October 20, 1976, (paid advertisement advising Burnett County voters that they should be able to vote on the county seat referendum); *Burnett County Sentinel,* October 27, 1976, ("Resolutions pass on county seat issue") (Facsimile Ballot/Notice of Referendum Election) (notice of county board resolution to submit question to the voters) (advertisement urging "yes" vote on county seat issue); *Inter-County Leader,* October 27, 1976, ("Burnett Supervisors Vote to Present County Seat Change to Voters on November 2") (advertisement urging "yes" vote on county seat issue) (Facsimile Ballot/Notice of Referendum Election); *Spooner Advocate,* October 28, 1976, ("Burnett County Has County Seat Fight"—"The issue has stirred up considerable interest in the county, and will probably result in bringing out a heavy turnout at the polls") (Facsimile Ballot Notice of Referendum Election) (advertisement urging "yes" vote); *Washburn County Register,* October 28, 1976, (Facsimile Ballot Notice of Referendum Election.)

[10] See n. 4.

James Donoghue, a professor of government and politics at the University of Wisconsin. Donoghue prepared charts and graphs based upon tally sheets of the voters in the November, 1976 election. These established that the voter turnout was the highest in the past 20 years.[11] Donoghue admitted that he had no accurate figure for the voting age population in Burnett County, but he estimated that approximately 80 percent of the voting age population did vote in the November, 1976 election.

Donoghue testified that voter turnout is highest for presidential elections and that the highest percentage of votes actually cast are for the president. Donoghue's calculations show that 98.4 percent of Burnett County voters voted for president. The percentage of votes cast declines among voters when choosing other national, state and local officers. For example, only 96.1 percent of the 6,558 voters cast ballots for the sheriff.

With respect to the county seat removal referendum Donoghue's figures reveal that 97.8 percent of the voters in the 16 districts allowed to vote did in fact vote on the question. This level of voter participation was second only to voting in the presidential election, according to Donoghue.

These figures belie the claim that inadequacy of notice prevented persons from going to the polls. The large voter turnout and participation in the county seat removal referendum election indicates that Burnett County voters were aware of and willing to decide the question. While questions of sufficiency and weight of expert evidence are for the fact finder to determine, *State ex rel. Ft. How. Paper v. Lake Dist. Bd.*, 82 Wis.2d 491, 263 N.W.2d 178 (1978), a court cannot ignore positive

---

[11] Professor Donoghue's graph of Burnett County voter turnout only dates back to 1956. Because the population of Burnett County has steadily increased, the voting turnout for the 1976 election was the highest in the county's history.

uncontradicted testimony in the absence of something which discredits it or renders it against reasonable probabilities. *State v. Public Service Comm.*, 16 Wis.2d 231, 114 N.W.2d 454 (1962). The trial court in the instant case could choose to not accept Donoghue's opinion "so far as any conclusion indicating that this referendum represented the will of the voters of Burnett County." It could not ignore evidence based upon election tally figures of the high voter turnout, however, despite the confusion appearing in news reports of the approaching election in autumn of 1976.

The instant case is similar to *Oaks*, 211 Wis. 571. In *Oaks*, notice of an election on a proposed charter ordinance which would change the form of Oshkosh city government from that of a commission to aldermanic was officially given on March 28, 1932 and April 4, 1932 for an April 5, 1932 election. This notice did not comply with existing statutes but the supreme court affirmed the trial court's findings that the election was valid because "the will of the electors could be ascertained." *Oaks*, 211 Wis. at 580, 249 N.W. at 53. The facts of *Oaks* showed that a spirited campaign over the merits of each form of government occurred in the six months preceding the election; that nearly 4,000 signatures on a petition to change the form of government had been obtained; that the vote cast was the largest ever cast for any Oshkosh election; that the proposed ordinance passed by a vote of 4,551 to 4,174; and, that this vote was not quite 50 percent of the registered voters and those who voted on affidavits.

In *Oaks* the supreme court refused to follow *Janesville Water Co.*, 156 Wis. 655. It explained that sec. 5.01, Stats., had been extended by the legislature after the *Janesville* case to apply "not only to primary elections but all elections held under the provisions of title II." *Oaks*, 211 Wis. at 578, 249 N.W. at 52. Accord-

ingly, whether failure to comply with election statutes voids an election depends upon the application of sec. 5.01, Stats. The court explained:

It is manifest that sec. 5.01(6) applies only after the holding of the election and the will of the electors has been manifested. When the matter has been allowed to proceed to that point, the will of the electors is to be given effect even though there may have been informalities or in some respect a failure to comply with the statute. *Oaks*, 211 Wis. at 579, 249 N.W. at 53.

The trial court in the instant action inappropriately relied on *Janesville Water Co.* It examined the quantity and quality of publicity and not the actual voter turnout, as required by *Oaks* and *Commonwealth Tel. Co.*, 219 Wis. at 612–13. *Cf. State ex rel. Kleist v. Donald,* 164 Wis. 545, 556, 160 N.W. 1067, 1071 (1917), [notice defect invalidated the election because of "the casting of a comparatively few out of a large number of votes for the relator."]. The testimony of three voters who claimed they *did not* vote because of confusion over the holding of the election is an unsuitable basis for finding inadequate notice when the number of persons who *did* vote is the determinative factor.

The trial court also improperly considered the potential votes of all non-voters. A voter turnout of 100 percent is implausible and unsupported by any evidence in the record. The facts remain that notice was given, public awareness of the issue was great, and voter participation substantial where it was allowed. The trial court did not apply the correct test in evaluating the notice defect and in finding such a defect fatal to this election.

There was substantial compliance with the notice statutes because the voter turnout demonstrates that the purpose of a notice requirement has been met. The

plaintiffs furthermore failed to prove that the result would have been different had the defect not occurred.

This failure of proof also bears on the effect of all other procedural defects in this case. We have found that sec. 5.01, Stats., requires a court to uphold an election if it can determine the will of the electors, *as expressed through their ballots*. The reason for this requirement is clear as courts should seek to uphold the determinations reached through the political decision-making process when a democratic majority has clearly expressed its views. *See Oaks*, 211 Wis. 571. Control over an election outcome should not be transferred to the judiciary merely because some irregularity mars an election. As nearly every election has some imperfection, endless litigation would result if election results could be challenged for every procedural violation. The effectiveness of judicial remedies in election challenges is also questionable. New elections are costly, inconvenient and are as capable of procedural irregularity as the first election. *See, Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1315–16 (1975).

Consequently, in order to successfully challenge an election a plaintiff must show the probability of an altered outcome. He must prove that the will of the electors would have favored the opposite result actually reached. *Karker v. Board of Unified School Dist.,* 51 Wis.2d 542, 548, 187 N.W.2d 160 (1971).

Since the primary justification for permitting elections contests is to ensure that electoral results fairly reflect the will of the electorate, the preferred and most common type of showing is a demonstration of some effect on the announced outcome of an election. *Developments in the Law—Elections,* 88 Harv. L. Rev. at 1316–17.

*See also* G. McCrary, *Elections* secs. 532–24 (4th ed. 1897); *Application of Moffat,* 142 N.J. Super. 217, 361

A.2d 74 (1976) ; *Magura v. Smith,* 131 N.J. Super. 395, 330 A.2d 52 (1974) ; *Wood v. Kirby,* 566 S.W.2d 751 (Ky. 1978) ; *Hollan v. Police Jury of Webster Parish,* 134 So.2d 132 (La. 1961) ; *Leffel v. Brown,* 159 N.E.2d 807 (Ohio 1959) ; *DeMartini v. Power,* 27 N.Y.2d 149, 262 N.E.2d 857 (1970) ; *Citizens for Referendum v. City of Worcester,* 375 N.E.2d 721 (Mass. 1978) ; *Hahn v. Graham,* 302 Minn. 407, 225 N.W.2d 385 (1975).

We reject the respondents' argument that election challengers need not prove that their position would have prevailed absent the election irregularities because they need only show a *different* result. This argument is based upon an erroneous reading of *Moffat,* 361 A.2d 74. *Moffat* dealt with the exclusion of votes due to the malfunctioning of a voting machine. Because *two* positions were to be filled in this election, challenger Moffat, who finished third, needed only to show that the machine error could have cost him enough votes to enable him to finish in second place. He did prove a changed "outcome," meaning his possible victory, even though the New Jersey election challenge statute required a showing of affected votes "sufficient to change the result" of the election. *Moffat,* 361 A.2d at 77. (Citing N.J. Stat. Ann. 19:29–1(e).)

The "outcome" test does not apply where elections involve fraud or where a candidate would stand to benefit by his own wrongdoing. *See Developments in the Law—Elections,* 88 Harv. L. Rev. at 1328–30; *Lowenstein v. Larkin,* 40 A.D.2d 604, 335 N.Y.S.2d 799 (1972) ; *Olson v. Lindberg,* 2 Wis.2d 229, 236, 85 N.W.2d 775 (1957). No issue of fraud in the conduct of this election exists, so the outcome test applies.

The ballots in this case showed that the will of the voters favored removing the county seat from Grantsburg to Siren. The trial court found the results of this referendum election to be:

Yes                           3,257
No                             588
No opportunity to vote         2,578
Opportunity but not voting     134

The trial court accepted figures provided by the plaintiffs which showed that the total of "no" votes and potential votes, had the ballots been provided to all Burnett County voters, would equal 3,302.[12]   A different outcome would be possible, the trial court found.

[12] The figures below were presented by the plaintiffs, and accepted by the trial court, which noted: "I do not find it necessary to determine that the figures submitted by plaintiff are accurate to the last person either with regard to the count on absentee ballots or the census of eligible non-voters."

### TABLE ONE
### YES VOTES = 3,257

| | | |
|---|---|---|
| (A) | "NO" VOTES | 588 |
| (B) | Voters in eight towns not voting | 2,578 |
| (C) | Absentee voters in eight towns not voting who did not return their absentee ballots | 6 |
| (D) | Exhibit 181—Absentee voters whom defendant admits were deprived of their opportunity to vote | 49 |
| (E) | Absentee ballots sent out for which there is no proof that absentee balloters received referendum ballots because clerk destroyed all records about absentee ballots (Schroeder, Town of Siren; Helm, Town of Swiss; Larrabee, Village of Webster) | 75 |
| (F) | Absentee ballots sent out prior to October 23, 1976, without referendum ballots and no ballots came back (Kline, Town of Scott) | 2 |
| (G) | Clerk can't remember if absentee ballots sent out on October 24 included referendum ballots (Kline, Town of Scott) | 2 |
| (H) | Absentee referendum ballots not sent out because they were not present when voters voted and voters didn't want to be sent additional ballot (Van Guilder, LaFollette) | 2 |
| **TOTAL** | | 3,302 |

We find, however, that the trial court erred and that the plaintiffs have not met their burden of proof. "To show an altered result generally requires identifying the voters who were affected, and then producing direct or in some cases circumstantial evidence as to how they voted or would have voted." *Developments in the Law— Elections,* 88 Harv. L. Rev. at 1318–19. No evidence was introduced that would show that *all* of the 2,578 voters denied the ballot would have voted "no." The trial court found that this was possible.[13] We disagree. Such a possibility stretches credulity and improperly lightens the burden of the party which must show a changed result. Such a finding is clearly "against the great weight and clear preponderance of the evidence," *Schmidt,* 18 Wis.2d at 321, 118 N.W.2d at 157, when the only evidence of the voting patterns of the 2,578 affected votes came from Professor Donoghue. This established that a unanimous "no" among the 2,578 voters was unlikely.

The trial court further lightened the plaintiffs' burden by counting 75 absentee voters among those denied the referendum ballots because the municipal clerks had destroyed their records about absentee ballots. Those clerks testified, however, that all absentee voters in their district were sent referendum ballots.

---

[13] The trial court did not consider that two of the eight districts denied the referendum ballot are centrally located. The Town of Daniels borders the Town of Siren and the Town of Lincoln is immediately above the Town of Daniels. Thus a unanimous "no" in those areas would seem virtually impossible, as many citizens in those areas would gain as much by having the county seat in Siren as persons living on the far eastern boundary of the county.

In Lincoln, 44 percent of the resident freeholders signed the petitions to place the county seat question on the ballot, while 37 percent did so in Daniels. It is not reasonable to assume these freeholders would have wanted the question on the ballot so as to vote "no" and preserve the status quo.

The plaintiffs had the burden of proving that the 75 absentee voters did not receive the referendum ballots from the election clerks. A presumption that the election officials legally discharged their official duties exists. 26 Am. Jur. 2d, *Elections* sec. 343 at 162 (1966). The clerks testified that they provided the ballots. The plaintiffs presented no evidence to rebut either the clerks' testimony or the presumption. The 75 voters should not have been counted among those denied the ballot. The result of subtracting these 75 voters from the "no" vote results in a total possible "no" votes of 3,227. This is 30 votes less than the actual "yes" votes, and assumes that 100 percent of the remaining votes in question would have been "no" votes.

We also agree with the Court of Appeals of New York in *DeMartini*, when it refused to invalidate an election where the successful candidate won by 62 votes.

It said:

Such invalidation will not be directed on the "mere mathematical possibility that the results could have been changed." . . . The burden lies with the party attempting to impeach the results to show that the "irregularities are sufficiently large in number to establish the probability that the result would be changed by a shift in, or invalidation of, the questioned votes." [Citations omitted.] *DeMartini*, 262 N.E.2d at 857–58.

Accordingly we find that the will of the electors was ascertainable in this case when the clear majority of voters approved the county seat removal. The plaintiffs did not disprove this. The many procedural defects cannot alter this result according to the mandate of sec. 5.01, Stats.

The trial court failed to properly heed sec. 5.01, Stats., by invalidating the election because of a generalized unfairness due to the jumbled fact situation surrounding the election. It found the election void by reading into the petition provisions of sec. 59.11(4), Stats.,

unnecessary procedural requirements. The petition process appeared legal in all respects. *State ex rel. Hawley v. Board of Sup'rs of Polk County and Another,* 88 Wis. 355, 60 N.W. 266 (1894) ; 23 Op. Att'y Gen. 414 (1934). It cannot be attacked after the election. 26 Am. Jur. 2d, *Elections* sec. 192 at 21 (1966). Because we are upholding the election and consequently the petition process, we need not address the constitutionality of sec. 59.11 (4), Stats., as requested by the appellants.

Because no fraud appears in the ballot preparation, distribution and canvassing process, the absence of a changed result prevents the remaining procedural irregularities from invalidating the election. 66 Op. Att'y Gen. 219 (1977).

For the sake of clarity we have extensively laid out the fact situation surrounding the unusual November, 1976 county seat removal election. A central figure in this election was County Clerk Nero. His decision to not prepare, distribute or canvass the ballots and his letter to election clerks advising them to not distribute the ballots produced the bulk of procedural irregularities in this case. Whatever his motivation,[14] Nero had

---

[14] The appellants characterize the county clerk's conduct as "arbitrary and autocratic." They suggest a general unity of purpose between the county clerk and the citizen's group opposed to the removal to thwart the county seat removal referendum election.

The trial court rejected such an assertion stating in its opinion: Mr. Nero had received a legal opinion on which he had a right to rely since in his view it came from the high source of the state election board. . . . He is apparently respected for his integrity and honesty within the community. . . .

In any event the people on each side of this issue believed in the validity of their stands and worked to accomplish their respective goals in what I believe was good faith. I find no conspiracy in that.

We need not, however, determine whether an ill-motivated conspiracy existed between Clerk Nero and the citizens opposed to the removal. Such a determination is not a factor in upholding this election.

no legal basis for refusing to comply with his statutory duties. As county clerk he was in the position to most effectively thwart the electoral process. The final decision as to the legality of an election does not rest with county clerks but with the courts. *See e.g., Clapp*, 21 Wis.2d 473. The actions of this clerk should not be allowed to deprive the majority of the electors in this election of their decision. *Ollmann*, 238 Wis. 574.

Accordingly, the decision of the trial court is reversed and the results of the November, 1976 county seat removal election should be reinstated.

*By the Court.*—Judgment reversed.