Mary Fishe **BELL** et al., Appellants,

v.

**J. W. SOUTHWELL** et al., Appellees.

No. 23582.

United States Court of Appeals
Fifth Circuit.

April 14, 1967.

C. B. King, Dennis J. Roberts, Albany, Ga., Jack Greenberg, Charles Stephen Ralston, Melvyn Zarr, New York City, for appellants.

George R. Ellis, Jr., Geo. R. Ellis, Americus, Ga., for appellees.

Before BROWN, GOLDBERG and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

A Georgia election was conducted under procedures involving racial discrimination which was gross, state-imposed, and forcibly state-compelled. Nevertheless the District Court by summary judg-

ment held it could not set aside such election or order a new one even though in parallel cases the unconstitutional discriminatory practices were enjoined and all persons arrested were ordered discharged immediately. We reverse.

The underlying facts out of which the controversy grew may be quickly stated. The Justice of the Peace for the 789th Militia District in Americus, Sumter County, Georgia, died on June 23, 1965. The Ordinary[1] on June 26, 1965, called a special election to fill the vacancy, which was held on July 20, 1965. Mrs. Mary F. Bell, one of the plaintiffs, a Negro, was a candidate as was the winner, J. W. Southwell, a defendant, and four other white men.[2] Following Georgia procedure, the results of the election were canvassed and the defendant J. W. Southwell declared the winner. Of the 2,781 votes cast, Negroes actually voting numbered 403 out of a total of 1,223 registered and qualified Negro voters in the District. On July 29, 1965, and after the expiration of the time for election contest under Georgia laws, this suit was filed. The District Judge by opinion denied relief for three reasons, two Georgia and one Federal. First, even as-

suming the admitted racial discrimination intimidated Negroes from voting, if all of the qualified Negroes not voting were added to the confined vote of Southwell's opponents, the result could not have been changed.[3] Second, if the election were voided, the Ordinary would be required to appoint the successor and the appointee would surely be Southwell. Third, Federal Courts simply do not have power to void a state election.

This suit, brought on their own behalf and on behalf of other Negroes and other voters in the District by Mrs. Bell, a qualified elector and candidate, and two other named Negro qualified voters, against the defendants Southwell and Horne, the Ordinary, invoked the Civil Rights Acts, 42 U.S.C.A. §§ 1971, 1981, 1983, 1985, 28 U.S.C.A. § 1343(3), (4). The main charge was that the election officials including the Ordinary had conducted the election in violation of the rights established under the Constitution and laws of the United States. The specific allegations fell in two categories, one relating to the election system and the second to specific acts of intimidation. In the first it was alleged that voting lists for the election were segre-

1. The Ordinary, elected by the people of the county for a term of four years, Ga. Code Ann. § 24–1702, has broad powers, including original, exclusive and general jurisdiction in matters relating to probate, administration of decedent's estates, guardianships, and "all such matters as may be conferred on them by the Consti-

tution and laws." Ga.Code Ann. § 24–1902. See also Ga.Code Ann. § 2–4102 (1948 rev.). Involved here is a special election called by the Ordinary to fill a vacancy in the office of justice of the peace pursuant to Ga.Code Ann. § 24–406 (Supp.1966).

2. The vote was:

| | | | |
|---|---|---|---|
| Winner: | J. W. Southwell | | 2,001 |
| Opponents: | Mary F. Bell | 332 | |
| | 4 others | 448 | 780 |
| | Total | | 2,781 |

3. 

| | | | |
|---|---|---|---|
| Southwell | | | 2,001 |
| Opponents (note 2) | | 780 | |
| Negro voters: | | | |
| Qualified | 1,223 | | |
| Voting | 403 | | |
| Not voting | | 820 | 1,600 |

gated on the basis of race. Likewise, voting booths were segregated according to race, with one booth for "white males", another for "white women", and a third for Negroes. During the course of the election, a number of qualified Negro women voters were denied the right to cast their ballots in the "white women's" booth. In the second group were charges that the officials barred representatives of candidate Bell from viewing the voting, another was physically struck by an election official and police allowed a large crowd of white males to gather near the polls thus intimidating Negroes from voting. In addition, the plaintiffs were commanded by a deputy sheriff, acting under directions of the Ordinary, to leave the white women's polling booth and after their respectful refusal to do so on the ground that they had the constitutional right to vote without being subjected to racial discrimination, they were arrested. With precision, through simultaneous motions for temporary restraining order, preliminary injunction, show cause orders, and the immediate release from arrest, the plaintiffs requested that the Court declare the defendant Southwell was not the legally elected Justice of the Peace, that he be enjoined from taking office, and that the Ordinary be ordered to call a new election.

■ In addition to the answer, which in the main admitted the maintenance of segregated voting lists and polling booths (group 1) and denied the specific acts of misconduct (group 2), the defendants filed a motion to dismiss and subsequently three affidavits which bore primarily on the election statistics (see notes 2 and 3, supra) and a verified

denial of the physical violence.[4] The Court properly treated it as a motion for summary judgment under F.R.Civ.P. 12(b).

It rounds out the picture to state that this record affirms without contradiction that two parallel companion cases were before the District Court, one by the United States against various officials of Sumter County, the other an identical suit by these appellants-plaintiffs against the same Georgia officials.[5] Hearing them simultaneously with the application for preliminary relief in the instant case, the District Judge in those two cases entered an injunction enjoining the defendants from maintaining racial segregation at the polls, from maintaining segregated voting lists, from arresting or interfering with Negro voters, and from prosecuting the plaintiffs for their conduct leading to their arrest on July 20, 1965.[6] 10 R.Rel.Law Rept. 1247.

Subsequently the Court on the basis of the pleadings and affidavits granted summary judgment, F.R.Civ.P. 12(b) for the defendants. In the opinion the Judge specified the three grounds previously mentioned—(1) the actions complained could not have affected the outcome of the election, (2) if the election were voided, a new election could not be ordered since §§ 24–406 and 408, Ga.Code Ann. requires the Ordinary to fill such a vacancy by appointment, (3) there is no authority, statutory, constitutional or equitable, for a Federal Court to void a state election.

We think that the Georgia problems are inconsequential and deserve only the later brief discussion. The claim invoked the protection of the Federal Court under statutes which assuredly give it

---

4. The answer categorically denied the specific allegations that the plaintiffs were arrested (see pars. XI, XII) for having insisted on using the "white women" polling booths. But the affidavits do not touch this incident. Consequently, for *motion to dismiss and summary judgment* purposes, these allegations must be taken as true.

5. United States v. Chappell, C.A. 579; Bell v. Horne, C.A. 580.

6. In view of these sweeping injunctions in the companion cases and the assurances of the defendants in the present case that they would maintain the status quo pending determination of the case on the merits, the District Court thought it unnecessary *to enter interim relief. This is* not questioned here.

jurisdiction to vindicate constitutional rights. Since it is clear that constitutional rights of the plaintiffs, the Negro voters as a class, indeed all voters, Negro and white, of the District were infringed, the sole question remaining is the sort of relief to be granted.

By the decrees in the companion cases (note 5, supra) which all properly consider to be a part of the matter presented additionally by this case, the trial Court in unmistakable terms and action characterized the practices as flagrant violations of the Constitution. These steps were taken, so the Judge said, "to insure that in the future, elections in Sumter County will be free from discrimination." Despite his determination that for the future these glaring racial discriminations could not go on, the trial Judge concluded that a Federal Court was either powerless—or at least ought not to exercise power—to set aside a State election. The Judge was apparently influenced by two factors. The first is one going to the existence of power or the propriety of its exercise. On the basis of Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, and other reapportionment cases, the trial Court recognizing that a prohibitory decree could took to the future, nevertheless held that it could not rectify the past since, as the Judge put it, "only a few minutes' reflection is needed to realize that the implications of such a decision would be staggering." The second slipped over into a Georgia reason that, granting the existence of this crude discrimination, there is no way to tell whether the result would have been different in its absence. Hence, no harm or injury is shown by these complaints. Neither of these factors warrant, in our view, the complete denial of relief.

■■ Drastic, if not staggering, as is the Federal voiding of a State election, and therefore a form of relief to be guardedly exercised, this Court in Hamer v. Campbell, 5 Cir., 1966, 358 F.2d 215, cert. denied, 1966, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79, expressly recognized the existence of this power. Of course as that opinion emphasizes, not every unconstitutional racial discrimination necessarily permits or requires a retrospective voiding of the election. But the power is present and *Hamer,* announced subsequent to the action of the District Court below, would require reversal without more for re-examination by the District Court of the appropriateness of injunctive relief.

■ As to the second we do not think the Court could justify denial of effective, present relief because of any assumed inability to demonstrate that the outcome would have been different. The appellants seem to suggest that the existence of such flagrant racial discrimination would raise a presumption that the vote of every actual and potential voter was affected. On that approach, it is not Negroes alone who suffer, it is the body politic as a whole, both Negro and white. And this is certainly true at least to the extent that the trial Court legally could not assume—as it evidently did—that all white voters would vote for white candidates, all Negroes for Negroes, or that no whites would vote for Negroes in a free, untainted election. See Hamer v. Campbell, supra, 358 F.2d 215, 219.

■ As long as we bear carefully in mind the limitations that *Hamer* imposes on this stringent relief, we think it is a mistake to cast this in terms of presumption. The fact is that there are certain discriminatory practices which, apart from demonstrated injury or the inability to do so, so infect the processes of the law as to be stricken down as invalid. Virginia State Bd. of Elections v. Hamm, 1964, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91, affirming, 1964, 230 F.Supp. 156. Thus in jury-race exclusion cases, once the evidence, either direct or by inference from statistical percentages, cf. Swain v. State of Alabama, 1965, 380 U.S. 202, 205, 85 S.Ct. 824, 827, 13 L.Ed.2d 759, 764; Whitus v. State of Georgia, 1967, 385 U.S. 545, 552 & n.2, 87 S.Ct. 643, 647, 17 L.Ed.2d 599, 605, establishes the existence of racial discrimination, the law requires that

the indictment (or the petit jury verdict of guilty) be set side even though the accused is unable to demonstrate injury in fact. Labat v. Bennett, 5 Cir., 1966 (en banc), 365 F.2d 698, 723 & n.43. And at times demonstrated actual discrimination is not even required if the racially conscious system affords a ready opportunity for it in practice. Avery v. State of Georgia, 1953, 345 U.S. 559, 73 S.Ct. 891, 73 L.Ed. 1244; Williams v. State of Georgia, 1955, 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161; Whitus v. State of Georgia, 1967, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599. Of course the Court discharging an accused from such indictment or conviction as a legalism finds that the accused was "prejudiced", but it is not in terms of the personal harm suffered or a factual demonstration that things would have turned out better. Rather, it is the law's recognition that in areas of such vital importance, state-imposed racial discrimination cannot be tolerated and to eliminate the practice or the temptation toward it, the law must extinguish the judgment wrought by such a procedure.

Even more directly, in connection with the elective process, the Supreme Court gave full play to this approach in striking down the Louisiana law requiring the designation of the race of each candidate on the ballot.[7] Anderson v. Martin, 1964, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430. It takes little transposition to substitute for the ballot's written racial candidate label the state-supplied racial marker for places and manner of voting. In each situation it is " * * * placing a racial label * * at the most crucial stage in the electoral process—the instant before the vote is cast * * *." By each mechanism "the State furnishes a vehicle by which racial prejudice may be so aroused as to operate against one group because of race and for another." And in both situations this "is true because by directing the citizen's attention to the sin-

gle consideration of race or color, the State indicates that * * * race or color is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot along racial lines." And as much for one as for the other, the " * * * vice lies not in the resulting injury but in the placing of the power of the State behind a racial classification that induces racial prejudice at the polls." 375 U.S. 399, 402, 84 S.Ct. at 456.

Once we get this far, no difficulty is encountered from the *Hamer* restrictions on the use of injunctive relief setting aside an election.

Although as earlier pointed out, injunctive relief setting aside the election was granted, we emphasized in *Hamer* that this "action does not mean that we necessarily would set aside every election in which a substantial number of citizens have been denied the right to vote." Going further, we remarked, "This is not a case where an election is challenged for the first time after it is held." 358 F.2d 215, 222. This leads the Georgia authorities to insist here that the relief sought was properly denied since the injunction was requested after the election was over.

But we certainly intended no such mechanical rule. In *Hamer* the vice sought to be corrected was the denial of the right to vote to Negroes through operation of the registration procedure. That was known to exist before the election was held. It was also known that the effects could not be eradicated except through equitable court relief. Here, of course, the vice occurred on election day upon the opening of the polls. It might be suggested that the Negro voters should have anticipated that the traditional practice of racially segregated lists and polling places would be maintained. But it was equally permissible for them to think that at this late date and in the atmosphere of that moment and the pas-

---

7. This was, of course, a suit prior to a primary and not one after the fact seeking to void the results of a racially tainted election. This distinction, however, bears upon the appropriateness of the relief and *Hamer* limitations to be placed upon it.

sage of successive Civil Rights statutes increasing protection against racial discrimination,[8] that these Georgia authorities would measure up to the demands of the Constitution.

There was really no effective relief available before the election. The moment the election process began, there was a protest by these Negro voters and others seeking an eradication of the discrimination and an opportunity for all members of that race, indeed for all voters, to vote without regard to race or color. That this self-help was not successful, indeed resulted in the unwarranted arrest and detention of those who protested, does not fault them for want of diligence. And within but a few days after the result of the election was published, this suit was filed as a part of an attack on many fronts.

■ Considering the gross, spectacular, completely indefensible nature of this state-imposed, state-enforced racial discrimination and the absence of an effective judicial remedy prior to the holding of the election, this is far removed from a belated effort to set aside retrospectively an election held long before on the ground that re-examination of the circumstances indicates a denial of constitutional rights on the part of candidates or voters, or both. Cf. McGill v. Ryals, M.D.Ala.N.D., 1966, 253 F.Supp. 374, 376, appeal dism'd, 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17. The parties here moved with unusual diligence and as was true in *Hamer,* relief " * * if it is to be had, must perforce come from the Court or the voters must simply be told to wait four more years." Hamer v. Campbell, supra, 358 F.2d 215, 222.

In the face of gross, unsophisticated, significant, and obvious racial discriminations in the conduct of the election and the now established power of a Federal Court to extinguish its effects even to the point of setting aside the election, the Georgia reasons relied on by the District Judge warrant but a brief comment. The Court's fundamental mistake was in assuming that this was an election contest as such in which the winner is challenged because of ineligibility, fraud or irregularities in the conduct of the election, the receipt or counting of illegal ballots which would change the result and the like,[9] and which, as a separate special statutory proceeding, must be timely filed [10] by specified persons following statutory procedures and in particular tribunals.[11] Mrs. Bell and her co-plaintiffs alone or as members of the class did not challenge the eligibility of Mr. Southwell or the fact that he received an overwhelming majority. Indeed, Mrs. Bell as a former candidate did not seek to be selected over Southwell or any other opponent. What, and all, she and others sought was an election conducted free of such indefensible, racial distinctions. That being so, it was not the usual simple case of count-

8. By the Civil Rights Act of 1957, Congress empowered the Attorney General of the United States to institute suits to protect the right to vote from deprivation because of race or color or because of threats or intimidation. This was supplemented by the Civil Rights Act of 1960, in which Congress gave the Attorney General full powers of inspection of documents in the custody of local voting registrars, and provided for a more comprehensive procedure of registration of Negroes where a pattern or practice of discrimination was disclosed.

These initial steps were considerably broadened and strengthened by the Civil Rights Act of 1964. Particularly pertinent here is the provision relating to voting rights, 42 U.S.C.A. § 1971, especially subparts (a) and (e). Approved August 6, 1965, subsequent to the election and suit here involved, is the most recent link in this chain of legislation, the Voting Rights Act of 1965. See generally Legislative History, 1965 U.S.Code Cong. & Adm. News, 89th Congress, 1st Sess., Vol. 2, pp. 2439–2440.

9. Ga.Code Ann. § 34–1703 (Supp.1966).

10. Ga.Code Ann. § 34–1705(a) (Supp. 1966) [Petition shall be filed within five days after the official declaration of the result in dispute.]

11. Ga.Code Ann. § 34–1702 (Supp.1966) [persons who may contest election]; Ga. Code Ann. § 34–1704(a) [suit in superior court of county where defendant resides]; Ga.Code Ann. § 34–1705 [procedures].

ing votes and denying relief for want of affirmative proof of a different result.

Equally lacking in merit is the Court's conclusion that setting aside the election would be ineffectual since, on his interpretation of the Georgia statute, § 24–408, prescribes that when an election is held and is determined not to have been valid, no re-election is held, but rather the Ordinary appoints a Justice of the Peace for the required term.[12] The Court assumed, with unquestioned basis probably, that the Ordinary would have appointed Southwell. Clearly, the Federal Constitution and the Federal Courts are not so helpless or unresourceful as to condemn in words only to let go by default in fact such an open breach of constitutional demands.

■ This leaves only a tag end. There is a suggestion that the District Court enjoining Southwell from taking office pursuant to the election would be powerless to grant affirmative relief requiring that the Ordinary call a special election. In this vital area of vindication of precious constitutional rights, we are unfettered by the negative or affirmative character of the words used or the negative or affirmative form in which the coercive order is cast. If affirmative relief is essential, the Court has the power and should employ it. State of Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, 589, affirmed, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed. 2d 112; Hamer v. Campbell, supra, 358 F.2d 215, 221.

The cause must therefore be reversed and remanded for the entry of an appropriate order setting aside the election and requiring the calling of a special election.[13]

Reversed with directions.

---

12. Appellants differ with this reading in the light of Ga.Code Ann. § 24–406 and Killorin v. Mitchell, 1914, 141 Ga. 524, 81 S.E. 443. We need not resolve this conflict.

13. The racial discriminations in the first category are for all practical purposes admitted, and these alone are sufficient to require the relief here directed. There is no need for further evidence as the specific acts of violence or other racial discrimination, including the arrest and confinement of the Negro plaintiffs, (see note 4, supra), set forth in the second group are superfluous.