Lillian McNALLY, Agnes A. Nelson, and Martha Johnson, on behalf of themselves and all other similarly situated, Plaintiffs-Respondents-Petitioners,

v.

Charles TOLLANDER and Burnett County, Defendants-Appellants.†

Supreme Court

*No. 78–783. Argued January 5, 1981.—Decided March 3, 1981.*

(Also reported in 302 N.W.2d 440.)

For the petitioners there were briefs by *Thomas D. Bell* and *Doar, Drill, Norman, Bakke, Bell & Skow* of New Richmond, and oral argument by *Thomas D. Bell.*

For the defendants-appellants there was a brief by *Earl Munson, Jr., David E. McFarlane, Mary E. Wen-*

---

† Motion for reconsideration denied, with costs, on April 13, 1981. ABRAHAMSON, J., took no part.

*dorff* and *La Follette, Sinykin, Anderson & Munson* of Madison, and oral argument by *Earl Munson, Jr.,* and *David E. McFarlane.*

DAY, J.  This is a review of a decision of the Court of Appeals published at 97 Wis.2d 583, 294 N.W.2d 660 (Ct. App. 1980) reversing the judgment of the Circuit Court for Burnett County: DOUGLAS S. MOODIE, Circuit Judge for Douglas County, Presiding.

This case presents a challenge to the validity of a referendum election held November 2, 1976, to remove the Burnett county seat from the village of Grantsburg to the town of Siren.  Numerous procedural irregularities occurred in the election and approximately forty percent of the registered voters were not given the opportunity to vote.  We hold that the deprivation of the right to vote of forty percent of the electorate demands that this court set aside the election.  We reverse the decision of the Court of Appeals.

Burnett county is located in northwestern Wisconsin on the Minnesota border.  The county seat is located in the village of Grantsburg in the western part of the county.  The idea of relocating the county seat to a more central location has been a subject of discussion in the county for many years.  The courthouse in Grantsburg is about seventy-five years old and generally considered inadequate.  The jail, also located in Grantsburg was built in 1888.

The Wisconsin Department of Corrections had informed the county that it would close and condemn the jail by August 2, 1976.  The need for a new jail and courthouse was part of the argument for removing the county seat to the centrally located town of Siren.

The removal of a county seat is governed by sec. 59.11, Stats. 1975.[1]  To initiate the process, sec. 59.11(4), requires that:

---

[1] "59.11.  **County seat; change.**  (1)  The county seat shall be fixed and designated by the county board at the first regular

"... a petition signed by at least one-half of the resident freeholders of the county as evidenced by the meeting after the organization of any county; and no county seat shall be changed except as provided in this section.

"(2) If two-fifths of the legal voters of any county, to be determined by the poll lists of the last previous general election held therein, the names of which voters shall appear on some one of the poll lists of said election, shall present to the county board a petition signed by them asking a change of the county seat to some other place designated in such petition, such board shall submit the question of removal of the county seat to a vote of the qualified voters of the county. Such election shall be held only on the day of the general election, notice thereof shall be given and the same shall be conducted as in the case of the election of officers on that day, and the votes shall be canvassed, certified and returned in the same manner as other votes at such election. The question to be submitted shall be 'Shall the county seat of . . . county be removed to . . . ,' and the ballots on such question shall be deposited in a separate ballot box.

"(3) If a majority of all the votes cast at such election on that subject are in favor of the proposed change, the chairman of the county board shall certify the same, with the attestation of the county clerk, to the governor, who thereupon shall issue his proclamation to that effect and cause the same to be published in the official state paper, and from the date of such publication the place so designated shall be the county seat of such county, and the county board shall not again submit the question of removal within five years.

"(4) However, when a county seat has been established in one place for a period of fifteen years or more, and the county has there erected permanent buildings of the value of not less than ten thousand dollars, the county seat shall not be removed, nor shall any application for its removal be submitted to a vote of the electors of the county unless a petition signed by at least one-half of the resident freeholders of the county as evidenced by the recorded deeds in the office of the register of deeds of the county, in favor of such removal, shall first be presented to the county board and filed in the office of the county clerk; and no such election to change any county seat shall be held for a period of five years after the year in which a courthouse or other county building costing three thousand dollars or more was built at the county seat and occupied for county purposes."

recorded deeds in the office of the register of deeds of the county, in favor of such removal, shall first be presented to the county board and filed in the office of the county clerk."

On November 20, 1975, George Benson, a Siren attorney who chaired a citizen's group in favor of removal, presented such a petition with some 2,000 signatures urging removal of the county seat to Siren.

On December 16, 1975, the county board established a "Petition Committee" to determine the number of resident freeholders in the county and the validity of signatures on the removal petition. Before the committee was appointed, the county finance committee and attorneys for a group opposed to the removal agreed that no names would be added or subtracted from the petition after November 20, 1975. This agreement was affirmed by the district attorney.

The committee, once appointed, prepared a list of resident freeholders. The petition was obtained by the committee on July 23, 1976, and the signatures compared to the freeholder list.[2] The number of qualified signatures on the original petition was 2,486 of a total of 5,727 resident freeholders, or 43.4%.

Four more petitions containing additional signatures were filed on July 15, August 19 and August 27, 1976.

Upon the advice of the district attorney that the agreed cut-off date was "improper," these petitions were joined with the original petition. In September of 1976, the committee determined that there were a total of 3,092 qualified petitioner signatures, of the total 5,727 resident freeholders.

---

[2] The county clerk on July 12, 1976, refused to turn the petition over to the committee without a release. Such a release was eventually signed by the members of the committee.

On September 17, 1976, the district attorney informed the county board that there was a sufficient number of petition signatures to hold the election.

The board found the number of petition signatures sufficient under sec. 59.11(4), Stats., and voted to submit the county seat removal question to the voters in the November, 1976, general election.

On September 29, 1976, the board directed the county clerk to prepare and distribute county seat removal ballots. The county clerk refused, based on an August 18, 1976 letter he had received from the executive director of the State Elections Board which stated it was too late to hold the referendum on the November 2nd ballot because notice was not published on the last Tuesday in May and the first Tuesday in June as required by sec. 10.06(2)(f), Stats. 1973.

A county board member then contacted the State Elections Board and, by a letter dated October 13, 1976, was informed by the legal counsel to the State Elections Board that "if the total vote on the county seat question were a significant percentage of the total votes on other offices, the election on the county seat question would be valid."

On October 21, 1976, the county board passed a resolution directing the county clerk to distribute ballots for the referendum and if he refused, directing the county board chairman to distribute ballots for the election.

The county clerk again refused, and the county board chairman appointed a committee which had ballots printed and distributed to all municipal precinct clerks between October 23 and 25, 1976.

On October 26, the county clerk sent a letter drafted by the attorney for the "Concerned Taxpayers," a group opposed to the removal of the county seat, to all election clerks directing them not to distribute the ballots and advising them that they could be subject to criminal liability if they did distribute the ballots.

On October 28, 1976, the district attorney sent letters to each of the election clerks informing them that it was not illegal to distribute the ballots and urging them to do so.

On October 27, 1976, formal notice of the referendum election was published in the official county newspaper. The published notice also appeared in two other weeklies on October 27 and October 28.

On October 30, a "telelecture" seminar was conducted by the University of Wisconsin Extension for county election officials. A number of Burnett county municipal election clerks attended, and the clerk for the town of Daniels asked the legal counsel for the State Elections Board whether ballots printed and delivered nine days prior to election by someone other than the county clerk would be legal. The legal counsel responded that the statutes provide that the county clerk has the exclusive authority to distribute and print ballots and that there are "possible criminal penalties for any election official who allows one to vote on a ballot other than an official ballot printed and distributed by the only means provided for in the statutes."

On the November 2, 1976, general election, 6,558 persons voted in Burnett county. Election clerks in eight western Burnett county towns refused to distribute the referendum ballots. The referendum ballots were distributed in the sixteen eastern towns.[3]

2,578 people, some forty percent of the voters in Burnett county, all residing in the western part of the county were denied referendum ballots and the opportunity to vote on the removal issue. Of those who were given ballots, 3,257 voted for removal, 588 voted against removal and eighty-six did not vote on the referendum.

---

[3] Forty-nine absentee voters in the sixteen eastern towns did not receive referendum ballots.

The referendum ballots were sealed in ballot bags and delivered with completed tally sheets to the county clerk, who placed the ballots in his vault.

In January of 1977, the Burnett county district attorney requested an opinion on the legality of the election from the attorney general. The attorney general opined that the election was valid despite various procedural irregularities. 60 Op Atty Gen 219 (1977).

A canvass of the referendum votes was finally conducted in August of 1977. On August 17, the chairman of the Burnett county board certified the results of the county seat removal election to acting Governor Martin Schreiber. This certification was not attested to by the new Burnett county clerk as required by sec. 59.11(3), Stats. The new county clerk refused to do so because he was not county clerk at the time of the election. On September 9, 1977, the results were recertified and the new clerk did attest to the county board chairman's signature.

On September 27, 1977, acting Governor Schreiber sought further clarification as to the validity of the election from the attorney general. The attorney general responded on November 3, 1977, that he would be "unable to say with the same assurance as before that the election would be held valid if a court test were brought," given notice of further procedural irregularities in the election. Nonetheless, Schreiber issued a proclamation on November 25, 1977, designating and establishing the town of Siren as the Burnett county seat and this proclamation was published in the official state newspaper.[4]

This action was commenced on December 9, 1977. The named plaintiffs are the wives of three members of the Burnett county board of supervisors who opposed the

---

[4] The proclamation was revoked by the acting Governor in December, 1978.

relocation of the county seat. The action was brought as a class action on behalf of the plaintiffs and other persons who were allegedly without notice of the referendum or were denied the opportunity to vote. The plaintiffs sought judgment against the defendant county and the chairman of the county board declaring the election invalid and a permanent injunction restraining any action to effectuate the removal of the county seat. A three-day trial was held in April of 1978. The trial court, finding "reasonable doubt overall that the election fairly represented the will of the voters of Burnett County," entered judgment on October 18, 1978, amended November 7, 1978, in which he declared the election void, granted the injunction and awarded costs against Burnett county in the amount of $1,633.91. The Court of Appeals reversed the judgment of the trial court. The plaintiffs-respondents-petitioners' (plaintiffs) petition for review was granted on July 10, 1980.

This court has decided many election contest cases. Typically, these actions are brought by losing candidates who have discovered irregularities in election procedures and sought to overturn the election results through *quo warranto* actions. In cases of that kind, the court has traditionally looked to the specific statutory election provisions involved to determine whether they were "directory or mandatory" provisions. *Lanser v. Koconis*, 62 Wis.2d 86, 214 N.W.2d 425 (1974). The court has consistently sought to preserve the will of the electors by construing election provisions as directory if there has been substantial compliance with their terms. *Gradinjan v. Boho*, 29 Wis.2d 674, 682, 139 N.W.2d 557 (1966). This approach is consistent with sec. 5.01(1), Stats. 1977, which provides:

"5.01 **Scope.** (1) CONSTRUCTION OF TITLE II. Title II shall give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstand-

ing informality or failure to fully comply with some of its provisions."

This case, however, is fundamentally different from other election cases considered by this court. Here, in addition to numerous procedural irregularities, some forty percent of the qualified voters were actually denied the opportunity to cast ballots. Whether such an election can be valid is a question of first impression in this court. We hold that the election must be set aside.

The Court of Appeals identified six instances of noncompliance with election statutes that occurred in this referendum election:

"(1) Notice was defective contrary to secs. 10.06 (2) (h), 10.01 (2) (a), (b) and (c), and 10.06 (2) (m), Stats; (2) Printing of the referendum ballots was arranged by a county board committee and not the county clerk contrary to secs. 7.10 (2) and 7.50 (1) (a), Stats; (3) Ballots were distributed by a county board committee, not the county clerk contrary to sec. 7.10 (3), Stats; (4) Ballots were not distributed to voters in eight districts contrary to sec. 7.15 (1) (c), Stats; (5) Ballots were canvassed by a county board committee, not the county clerk contrary to sec. 7.60, Stats; (6) The ballots provided by the county board committee were cast and counted in the election contrary to sec. 7.50 (1), Stats." *McNally v. Tollander*, 97 Wis.2d 583, 602, 294 N.W.2d 660 (Ct. App. 1980).

These election defects were not discovered after the election results were in. Rather, the record shows that the election statutes were intentionally ignored by public officials who were anxious to put the referendum issue on the November 1976 general election, even though the statutory requirements could not be timely met. Proper notice and simple compliance with the clear language of the election statutes would have avoided the problems now before us, that have now delayed resolution of the county seat question for over four years.

Because we hold that the failure to provide ballots to forty percent of the voters by itself requires that the election be set aside, we need not consider whether the several other defects involved mandatory provisions that would provide additional bases for setting aside the election.

The Court of Appeals relied on this court's decision in the very early case of *State ex rel. Wold v. Hanson*, 87 Wis. 177, 58 N.W. 237 (1894), in sustaining this election, despite the massive exclusion of qualified voters.

*Hanson* was a *quo warranto* action in which the plaintiff, a losing candidate in a circuit court clerk election, sought to be placed in that office and to have the winning candidate excluded. The plaintiff's action was premised on the fact that eighteen qualified voters who desired to vote for him were excluded from the polling place because election clerks erroneously believed they were not qualified voters. If all eighteen disenfranchised voters had cast their ballots for the plaintiff, he would have won the election by five votes.

This court let the election stand, stating that:

> "The exclusion of legal votes—not fraudulently, but through error in judgment—will not defeat an election. It is an error which there is no mode of correcting, even by the aid of the courts, since it cannot be known with certainty afterwards how the excluded electors would have voted; and it is obvious that it would be dangerous to receive and rely upon their subsequent statements as to their intentions, after it is ascertained precisely what effect their votes would have had upon the result. . . . *An election honestly conducted under the forms of law ought generally to stand, notwithstanding individual electors may have been deprived of their votes,* or unqualified voters have been allowed to participate. Individuals may suffer wrong in such cases, and a candidate who was the real choice of the people may sometimes be deprived of his election; but, as it is generally impossible to arrive at any greater certainty of result by resort to oral evidence, public policy is best subserved

by allowing the election to stand, and trusting to a strict enforcement of the criminal laws for greater security against the like irregularities and wrongs in the future." (Quoting Cooley, Const. Lim., 781 (6th ed.) (Emphasis added.) *Hanson, supra,* 87 Wis. at 179.

We agree with this statement as a general rule. But the facts of the case before us set it apart from the usual election contest case. First, the number of voters who were denied ballots in the present case was very substantial. Some 2,500 voters, approximately forty percent of the electorate, were denied ballots.

Second, this is not a *quo warranto* action brought by a losing candidate for elective office. Instead, we are confronted with an entire class of voters whose right to participate in a referendum election was denied through no fault of theirs.

In *Clapp v. Joint School District,* 21 Wis.2d 473, 124 N.W.2d 678 (1963), this court suggested that a case involving deprivation of the right to vote would be treated differently from the run of cases involving procedural irregularities. The court in *Clapp* stated:

"We do not have a case of a resident demanding an absentee ballot for himself and being refused by a school-district clerk and without such an affirmative proof, the election ought not to be held void if it is considered the furnishing of absentee ballots is mandatory." *Clapp, supra,* 21 Wis.2d at 481.

The case now before us does present that affirmative proof of voters denied ballots. And, while absentee voting is a privilege, *Clapp, supra,* 21 Wis.2d at 481, the right to vote is constitutionally protected. Article III, Section 1 of the Wisconsin Constitution establishes the right to vote generally.[5] In addition, the right to vote

---

[5] "Article III. Suffrage. *Electors.* Section 1. [As amended Nov. 1882, Nov. 1908 and Nov. 1934]. Every person, of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state for one year

on the removal of a county seat is specified in Article XIII, Section 8 of the Wisconsin Constitution.[6]

The right to vote is the principal means by which the consent of the governed, the abiding principal of our form of government, is obtained. As this court stated in *State ex rel. Frederick v. Zimmerman,* 254 Wis. 600, 613, 37 N.W.2d 473 (1949):

"The right of a qualified elector to cast a ballot for the election of a public officer, which shall be free and equal, is one of the most important of the rights guaranteed to him by the constitution. If citizens are deprived of that right, which lies at the very basis of our democracy, we will soon cease to be a democracy. For that reason no right is more jealously guarded and protected by the departments of government under our constitutions, federal and state, than is the right of suffrage. It is a right which was enjoyed by the people before the adoption of the constitution and is one of the inherent rights which can be surrendered only by the

next preceding any election, and in the election district where he offers to vote such time as may be prescribed by the legislature, not exceeding thirty days, shall be deemed a qualified elector at such election:

"(1) Citizens of the United States,

"(2) Persons of Indian blood, who have once been declared by law of congress to be citizens of the United States, any subsequent law of congress to the contrary notwithstanding.

"(3) The legislature may at any time extend, by law, the right of suffrage to persons not herein enumerated; but no such law shall be in force until the same shall have been submitted to a vote of the people at a general election, and approved by a majority of all the votes cast on that question at such election; and provided further, that the legislature may provide for the registration of electors, and prescribe proper rules and regulations therefor."

[6] "Removal Of County Seats. SECTION 8. No county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county voting on the question shall have voted in favor of its removal to such point."

people and subjected to limitation only by the fundamental law."

Because the right to vote is so central to our system of government, this court has consistently sought to protect its free exercise.

In *State ex rel. Symmonds v. Barnett,* 182 Wis. 114, 195 N.W. 707 (1923), the ballots of certain voters were not counted, because the voter's names did not appear on the voter registration list. These voters were, however, duly registered voters who had voted in the preceding primary election. Only the failure of the registration board to update the registration list explained the omission of their names. This court ordered that the votes of these voters must be counted, stating:

"As a general rule a voter is not to be deprived of his constitutional right of suffrage through the failure of election officers to perform their duty, where the elector himself is not delinquent in the duty which the law imposes on him. *State ex rel. Wood v. Baker,* 38 Wis. 171; 9 Ruling Case Law, 1093." *Barnett, supra,* 182 Wis. at 127.

In *Ollmann v. Kowalewski,* 238 Wis. 574, 300 N.W. 183 (1941), 305 ballots had been initialed by one election clerk on behalf of both election clerks, rather than being initialed by each election clerk individually, in violation of the statutes. This court held that the 305 ballots were properly counted stating that:

"The voter would not knowingly be doing wrong. And not to count his vote for no fault of his own would deprive him of his constitutional right to vote . . . A statute purporting so to operate would be void, rather than the ballots." *Ollmann, supra,* 238 Wis. at 578.

Citing *State ex rel. Wood v. Baker,* 38 Wis. 71, 89 (1875), this court held that:

". . . The voters' constitutional right to vote 'cannot be baffled by latent official failure or defect.'" *Ollmann, supra,* 238 Wis. at 579.

While in *Barnett* and *Ollmann,* the right to vote could be vindicated by counting the defective ballots and upholding the election, that remedy is unavailable when the ballots were neither distributed nor cast.

We conclude that the exclusion of these 2,578 voters so undermines the appearance of fairness in the election that the election must be set aside.

The court is not unmindful of the stringency of the remedy of setting aside an election. However, this is not a case where that remedy will render an elective office vacant or otherwise unduly burden the administration of government in Burnett county. Rather, by setting the election aside, the *status quo,* as it has been for more than one hundred years, will be preserved. If the electors of Burnett county choose to remove the county seat to Siren, that change may be accomplished by a regularly conducted referendum in which all qualified voters participate.

The defendants argue that, notwithstanding the deprivation of the right to vote of forty percent of the voters, the election should not be overturned because the outcome of the election could not have been changed.[7] The defendants have cited several cases, from among the many to be found in the reports, standing for the proposition that the "outcome test" is widely recognized in other jurisdictions. None of these cases involve the wholesale deprivation of the right to vote that makes the present case an anomaly of American law. In fact, the courts in some of the cited cases expressly noted that no deprivation of the right of qualified voters to vote was involved. *Jardon v. Meadowbrook-Fairview Metropolitan District,* 190 Colo. 528, 549 P.2d 762, 765 (1976) ; *McNulty v. Board Of Supervisors Of Elections,* 245 Md. 1, 224 A.2d 844, 848 (1966).

---

[7] For purposes of discussion, we assume that the outcome of this election could not have been changed even if all qualified voters who did not receive ballots voted "no."

The recent case of *Files v. Hill,* 594 S.W.2d 836 (Ark. 1980), cited to us by defendants, did present a claim of deprivation of the right to vote. In *Files,* one of two consolidated cases was a class action brought by a representative of persons allegedly denied the right to vote for a write-in candidate.[8] The plaintiffs sought to have the election voided on the basis of an Arkansas constitutional provision guaranteeing the free exercise of the right of suffrage. The Supreme Court of Arkansas found the plaintiffs had failed to state a claim because no allegation had been made that the election results would have been different if the votes of the plaintiff class had been counted. While *Files* does support the application of the outcome test in an action involving deprivation of the right to vote, the maximum number of alleged depriva-

---

[8] The following is a list of problems that allegedly resulted in the inability of the members of the class to vote:

"A. Instructions concerning write-in votes were not sufficiently clear.

"B. Pencils were not furnished for the convenience of voters.

"C. Voting machines did not function properly and it was impossible for many voters to cast a write-in vote for plaintiff Files.

"D. Voters were instructed that long lines waiting at the polls were caused by write-in voters and that electors could vote more quickly by using machines that were not functioning to accept write-in votes.

"E. Instructions for voting for write-in candidate Files were given by election officials, resulting in ballots not being counted although the instructions were followed.

"F. Electors, attempting to vote for plaintiff Files and following instructions of election officials, wrote plaintiff's name on masking tape, and on parts of the voting machine in an effort to cast votes for plaintiff Files, with the result that said votes were not counted.

"G. In some instances it was physically impossible for a voter to cast his ballot for plaintiff Files on a voting machine." *Files, supra,* 594 S.W.2d at 838.

tions in that case equalled only about three percent of the electorate.[9]

Because the case before us involves clear deprivations of more than forty percent of the voters, we do not find the *Files* decision persuasive.

The Court of Appeals held the outcome test applicable to this case, stating:

". . . in order to successfully challenge an election a plaintiff must show the probability of an altered outcome. He must prove that the will of the electors would have favored the opposite result actually reached." *McNally, supra,* 97 Wis.2d at 609.

The only exception to this "outcome rule" acknowledged by the Court of Appeals, would be where a candidate would stand to benefit from his own wrongdoing or where fraud was involved. *McNally, supra,* 97 Wis. 2d at 610.

We agree with these statements as they apply to most cases of election irregularities. But in a case where deprivations of the right to vote are so significant in number or so egregious in character as to seriously undermine the appearance of fairness, we hold such an election must be set aside, even where the outcome of the election might not be changed.

". . . courts should use their discretion to avoid elections where proven violations have undermined the appearance of fairness of an election. For example, when many voters see election officials stuffing ballot boxes, or *when large numbers of voters are prevented from voting,* public confidence in the integrity of the election —and popular acceptance of the winner—may be severely impaired. In such cases a new election might be justified to remedy these effects, regardless of the likelihood that the election's outcome was altered." *Devel-*

---

[9] The complaint alleged that 1,522 voters were deprived of the right to vote. The total number of votes cast was 47,401.

opments In The Law—Elections, 88 Harv. L. Rev. 1111, 1330 (1975). (Emphasis added.)

This approach was applied in *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967). In *Bell*, a number of black voters were intimidated from voting by a large crowd of whites and a number of qualified black women were denied the right to cast their ballot in the "white women's" voting booth. Although it was clear that the infringement of these voter's rights did not change the outcome of the election, the Court held that the election must be set aside.

"The fact is that there are certain discriminatory practices which, apart from any demonstrated injury or inability to do so, so infect the processes of the law as to be stricken down as invalid." *Bell, supra*, 376 F.2d at 662.

The court in *Bell*, recognized, as we do, that a deprivation case differs from an election contest in which the winner is challenged because of irregularities.

"Mrs Bell and her co-plaintiffs alone or as members of the class did not challenge the eligibility of Mr. Southwell or the fact that he received an overwhelming majority. Indeed, Mrs. Bell as a former candidate did not seek to be selected over Southwell or any other opponent. What, and all, she and others sought was an election conducted free of such indefensible, racial distinctions. That being so, it was not the usual simple case of counting votes and denying relief for want of affirmative proof of a different result." *Bell, supra*, 376 F.2d at 664–665.

As the trial court found this case involved no fraud. Nor does it involve the kind of "indefensible, racial distinctions" that tainted the election in *Bell*. However, the disenfranchisement of such a substantial number of voters, make this a case where the processes of the law are so infected as to require nullification of the election.

The Court of Appeals expressed concern with the effect of setting aside the election on the majority of voters who did vote.[10] We conclude the temporary "disenfranchisement" of those voters is preferred to the permanent disenfranchisement of the forty percent of voters who were denied the right to vote.

*By the Court.*—The decision of the Court of Appeals is reversed.

ABRAHAMSON, J., took no part.

---

[10] The court stated that:

". . . were this court to set aside the election on the basis of ballot deprivation to some voters, we would disenfranchise the majority of voters who did express their preference at the polls." *McNally, supra,* 97 Wis.2d at 595.