## David Putter v. Montpelier Public School System, et al.

[697 A.2d 354]

No. 96-419

Present: **Amestoy, C.J., Gibson, Dooley and Morse, JJ.**

Opinion Filed June 6, 1997

*Joshua R. Diamond,* Montpelier, for Plaintiff-Appellant.

*Douglas D. Le Brun* of *Dinse, Erdmann, Knapp & McAndrew, P.C.,* Burlington, for Defendants-Appellees.

**Morse, J.** Plaintiff David Putter appeals from a judgment of the Washington Superior Court dismissing as untimely his action to invalidate a municipal election, but allowing him to proceed with his claim for other forms of relief. We conclude that the judgment was correct, although for reasons different from those stated by the trial court, and affirm.

## I.

On March 5, 1996, voters in the City of Montpelier approved the annual operating budget proposed by the Board of School Commissioners, as well as a multi-million-dollar bond proposal for the construction of various school improvements. Four weeks after the election, plaintiff filed this action against the Montpelier Public School System, claiming that the election had been tainted by the Board's funding, publication and distribution, shortly before the election, of a newsletter entitled "Class Acts." The newsletter's lead article focused on the reasons underlying the proposed 2.4% operating budget increase and school bond proposal. It stated that "[s]tudent learning will remain the focus for our schools for the immediate future if our operating budget and facility bond proposals are supported," and warned that without the increased funding some reduction in programs, services and educational opportunities would occur.

The twelve-page newsletter contained two other articles relating to the upcoming election. One addressed the proposed budget in a

question-and-answer format, explaining that approval was necessary to avoid further cuts in services and programs and to maintain the current student-to-teacher ratio; the article also contained graphs and charts illustrating the respective local, state and federal shares of the budget. Another story addressed the bond proposal, describing the current shortcomings in existing school facilities and detailing how and where the bond monies would be spent. Each of the foregoing articles contained a subcaption and a cartoon urging readers to "Vote Yes" on the ballot proposals. In addition to the materials referenced in the complaint, plaintiff claims to have subsequently discovered that defendant also distributed leaflets and promotional stickers advocating passage of the school bond.

Plaintiff alleged that by expending public funds and resources in a "partisan" fashion, defendant had "improperly influenced the election on Article 13" (the bond proposal). In five separate counts, he claimed that defendant had thereby: (1) exceeded its lawful authority; (2) conferred a government "emolument" upon the private citizens who created the articles in violation of Chapter I, Article 7 of the Vermont Constitution; (3) violated the guarantee of a republican form of government set forth in Article IV, Section 4 of the United States Constitution, and contravened Chapter I, Articles 6 and 8 of the Vermont Constitution, which provide, respectively, that all officers of government are the "trustees and servants" of the people, and that "all elections ought to be free and without corruption"; (4) engaged in "viewpoint discrimination" in violation of the First Amendment of the United States Constitution and its equivalent in the Vermont Constitution; and (5) compelled plaintiff to endorse a political position he opposed, contrary to the free speech clauses of the United States and Vermont Constitutions.

The allegations of federal constitutional law were brought under 42 U.S.C. § 1983, which confers a private federal right of action for damages and injunctive relief against state actors who deprive any citizen of "rights, privileges, or immunities secured by the Constitution and laws." In these, as in the other counts, plaintiff sought a variety of remedies, including a declaration that the election approving the bond proposal was invalid; an order enjoining defendant from utilizing public resources to advocate a partisan position; reimbursement for all funds illegally expended; and damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988.

Defendant moved to dismiss the complaint on the ground, among others, that the suit was untimely under 17 V.S.A. § 2603. Under that

section, "[t]he result of an election for any office, other than for the general assembly, or public question may be contested by any legal voter entitled to vote on the office or public question to be contested." *Id.* § 2603(a). A contest is initiated by filing a complaint in superior court alleging that errors were committed in the conduct of the election, that there was fraud in the electoral process, or "that for any other reason" the election was invalid. *Id.* § 2603(b). The complaint must be filed within *fifteen days* after the election, or, if there is a recount, within ten days after a court issues its judgment on the recount. *Id.* § 2603(c).

Plaintiff opposed the motion claiming that suit under § 1983 is governed by the local statute of limitations applicable to personal injury actions, which in Vermont is three years. See 12 V.S.A. § 512(4). The trial court selected the limitations period most analogous to the specific forms of relief sought, applying the fifteen-day period to plaintiff's effort to invalidate the election, and the three-year period to the extent that plaintiff was seeking relief for other injuries. Accordingly, the trial court dismissed as untimely the challenge to the election result, but otherwise allowed the action to proceed. Finally, finding no reason for delay, the trial court ordered entry of final judgment with respect to the order dismissing the challenge to the election result. See V.R.C.P. 54(b).

## II.

Whether the trial court properly applied the fifteen-day limitations period of 17 V.S.A. § 2603(c) to the federal claims presents an interesting question, but not one that the Court must decide in this matter. The United States Supreme Court has held, to be sure, that a single state statute of limitations applies to "all § 1983 claims," and that the most appropriate limitations period is that applicable to personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 275, 280 (1985). The high court has reaffirmed this rule on several occasions. See *Felder v. Casey,* 487 U.S. 131, 143 (1988) (holding that application of 120-day notice-of-claim rule to § 1983 actions was "incompatible with the compensatory goals of the federal legislation"); *Burnett v. Grattan,* 468 U.S. 42, 54-55 (1984) (application of six-month limitations period for employment discrimination claims was inadequate to accomodate complexities of federal civil rights actions).

The Supreme Court has not considered, however, whether a state may, for good and sufficient reasons, apply a shorter limitations period to one particular equitable *remedy* available under § 1983,

such as election invalidation, as opposed to the § 1983 claim in its entirety. Strong arguments could be advanced on either side of the question. On the one hand, where the constitutional infringement is sufficiently egregious, it could be argued that denial of the new-election remedy is tantamount to a denial of the right itself. On the other hand, the state's interest in finality of elections may be sufficiently compelling to justify a shorter limitations period where other remedies exist to cure the infirmity.

As noted, however, we need not resolve this particular issue. For the judgment, as explained below, may be affirmed on a separate ground.

## III.

Even assuming that plaintiff's § 1983 suit was timely, the fundamental question remains whether plaintiff has stated a claim for which the extraordinary equitable remedy of election invalidation can be granted. Although not raised below, the issue was briefed by the parties on appeal, and is dispositive of the matter.

Invalidation of an election requires more than merely a claim of election irregularity, even one of constitutional dimensions. As one author has explained, "The fact that the invalidation power is rooted in equity is the key to the usefulness of this remedy, for it means that the determination of illegality in the electoral process does not automatically invoke the new-election remedy. The . . . judge sitting . . . in equity may detect malfeasance, perhaps of an egregious nature, but nonetheless stay his hand in providing full relief." K. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U. L. Rev. 1092, 1099 (1974) (footnote omitted); see also *Gjersten v. Board of Election Comm'rs*, 791 F.2d 472, 478 (7th Cir. 1986) (court need not exercise equitable power of invalidation in response to all unconstitutional election practices).

Voiding an election and ordering a new one represents one of the more extreme remedial measures available to a court sitting in equity. Nothing is so profoundly destabilizing to the local political process; budgets or projects debated during the campaign and approved by the electorate must invariably be delayed or postponed, and lame-duck incumbents may be unable as a practical matter to conduct the public business for which they were elected. See *Gjersten*, 791 F.2d at 479; *McGill v. Ryals*, 253 F. Supp. 374, 376 (M.D. Ala.), *appeal dismissed*, 385 U.S. 19 (1966); Starr, *supra*, at 1105-06, 1128.

As a result, courts reviewing election challenges under federal law have established a high threshold for what one court has described as

the "[d]rastic, if not staggering" equitable remedy of election invalidation. *Bell v. Southwell*, 376 F.2d 659, 662 (5th Cir. 1967); see also *Gjersten*, 791 F.2d at 478 (courts should not lightly "resort to this intrusive remedy"). "The setting aside of an election is an extraordinary remedy," observed the court in *Smith v. Paris*, 257 F. Supp. 901, 905 (M.D. Ala. 1966), "which the Court should grant only under the most extraordinary of circumstances." Dilution of votes through malapportioned districts, *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); purposeful or systematic discrimination against voters of a certain class, *Hadnott v. Amos*, 394 U.S. 358, 366-67 (1969); pervasive election fraud, *Griffin v. Burns*, 570 F.2d 1065, 1074, 1078-80 (1st Cir. 1978); and "other wilful conduct which undermines the organic processes by which candidates are elected," *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975), represent the kinds of violations for which courts have typically employed the new-election remedy.

Conversely, courts have frequently declined to order a new election where the governmental misconduct, considered in light of all the circumstances, did not warrant so extraordinary and destabilizing a remedy. See, e.g., *Saxon v. Fielding*, 614 F.2d 78, 79-80 (5th Cir. 1980); *Hennings*, 523 F.2d at 864; *Hamer v. Ely*, 410 F.2d 152, 156 (5th Cir.), *cert. denied*, 396 U.S. 942 (1969). In determining whether such drastic relief is warranted, courts have focused on several key considerations, including the nature and severity of the federal violation, the probability that it actually affected the election result, the presence or absence of culpable intent, and the harm to the organic processes of the election. *Gjersten*, 791 F.2d at 478-79; *Bodine v. Elkhart County Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986); *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983); *Hennings*, 523 F.2d at 864.

█ Considered in the light of these criteria, plaintiff's claims fall well below the requisite threshold for election invalidation. The United States Constitution protects the right of all qualified citizens to vote in state and federal elections, *Reynolds*, 377 U.S. at 554, and to have their votes counted without debasement or dilution. *Hadley v. Junior College Dist.*, 397 U.S. 50, 52 (1970). Plaintiff here has not alleged that any qualified voters were denied the right to vote in the school bond election, or that their votes were improperly diluted through deliberate governmental contrivance. Rather, he asserts in broad terms that defendant "improperly influenced" the election by disseminating "partisan" pamphlets to the electorate in violation of the Vermont and United States Constitution. He does not allege that

any electors actually changed their votes as a consequence of reading the disputed materials, or that municipal voters were actually "influenced" in sufficient numbers to alter the election result.

Courts generally "require the plaintiffs to demonstrate that the unconstitutional practice had a *significant impact* on the particular election they seek to have declared invalid." *Gjersten,* 791 F.2d at 479 (emphasis added). Although some courts have required as little as a "reasonable possibility" that a violation affected the result, *Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir. 1973), *cert. denied,* 417 U.S. 910 (1974); *Saxon,* 614 F.2d at 79, plaintiff here has not alleged even this much. Furthermore, while there is some authority for invalidation even absent such proof, this has generally occurred only in cases where the governmental misconduct was extreme and intentional, and the remedy was deemed necessary to extinguish the taint. See, e.g., *Bell,* 376 F.2d at 664-65 (despite noneffect on outcome, invalidation remedy was appropriate in light of "gross, spectacular, completely indefensible" racial discrimination in election process); *Starr, supra,* 49 N.Y.U. L. Rev. at 1115-16 ("Whether the illegality complained of actually affected the outcome is of secondary importance . . . so long as there is substantial illegality resulting from culpable intent, or the form which the illegality takes is highly egregious.") (footnotes omitted).

Plaintiff's complaint alleges nothing even remotely suggestive of "extreme" or "indefensible" governmental malfeasance. This is not to imply that his claims lack merit. Although not before us, plaintiff's assertion that the federal Constitution prohibits governmental entities from spending public funds to promote partisan positions in election campaigns finds support in a number of judicial authorities. See *Alabama Libertarian Party v. City of Birmingham,* 694 F. Supp. 814, 816-21 (N.D. Ala. 1988); *Mountain States Legal Found. v. Denver Sch. Dist.,* 459 F. Supp. 357, 360 (D. Colo. 1978); *Stanson v. Mott,* 551 P.2d 1, 8-9 (Cal. 1976); see generally *Carter v. City of Las Cruces,* 915 P.2d 336, 338-39 (N.M. Ct. App. 1996) (collecting cases). Several respected commentators have also explored the question of whether official "partisanship" through the act of disseminating campaign literature violates the constitutional rights of those opposed to the government's position. See S. Shiffrin, *Government Speech,* 27 U.C.L.A. L. Rev. 565 (1980); M. Yudof, *When Governments Speak: Toward A Theory of Government Expression and the First Amendment,* 57 Tex. L. Rev. 863 (1979); E. Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship,* 21 B.C. L. Rev. 578 (1980).

■ But even assuming their technical merit, plaintiff's arguments preclude any finding of *willful* misconduct. However well pled, the constitutional claims are relatively novel, the supporting authorities comparatively sparse, and the rules defining the scope of permissible conduct currently unsettled; the issue, in short, is one about which reasonable minds may easily disagree. Indeed, most courts and commentators acknowledge that the line between providing "neutral information" and promoting "partisan" views on election issues may be "exceedingly difficult" to draw. Yudof, *supra*, at 899; see also *Stanson*, 551 P.2d at 12 ("the line between unauthorized campaign expenditures and authorized informational activities is not so clear"); Shiffrin, *supra*, at 655 (subject contains far too many complexities "to make the government speech problem an easy one to resolve"); Ziegler, *supra*, at 615 (discussing the "dilemma of distinguishing proper from improper government conduct in this context"). As the Court in *Buckley v. Valeo*, 424 U.S. 1, 91-92 (1976), noted, virtually every public expenditure will to some extent involve a use of public money as to which some taxpayers may object. Nevertheless, this does not mean that those taxpayers have a constitutionally protected right to enjoin such expenditures.

Thus, regardless of whether the disputed materials actually crossed the nebulous line separating information from propaganda, the claimed constitutional infringement provides no basis for a finding that the Board willfully and knowingly violated plaintiff's constitutional rights. As noted, courts have occasionally invoked the new-election remedy as a punitive measure "to wipe out any fruits of *indefensibly* illegal conduct," Starr, *supra*, at 1119 (emphasis added); conversely, the absence of willful misconduct has been a prime consideration in rejecting the invalidation remedy. See *Allen v. State Bd. of Elections*, 393 U.S. 544, 572 (1969) (invalidation of election unwarranted where despite violations of Voting Rights Act, case involved "complex issues of first impression" barring finding that defendant's conduct "constituted deliberate defiance of the Act"). Ordering a new election absent any basis for a finding that the disputed materials were outrageously illegal or significantly skewed the election outcome would thus grossly exceed the alleged wrongdoing.

■■ In sum, plaintiff's § 1983 claims do not — and cannot — even remotely approach the level of extremity, culpability or undue influence on the electoral process necessary to warrant the extraordinary remedy of election invalidation. Plaintiff's constitutional

claims involve complex issues of first impression that bar any possibility of a finding of willful or outrageous misconduct. See *Allen*, 393 U.S. at 572. Accordingly, albeit for a different reason from that stated by the trial court, we conclude that the judgment dismissing the challenge to the election result, but otherwise permitting the action to proceed, was correct. The judgment, therefore, may properly be affirmed. See *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 613, 572 A.2d 921, 925 (1990) (this Court may affirm correct judgment even though grounds stated in support of it are erroneous).

*Affirmed.*